FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY - 6 1994

JAMES W. McCORMACK CLERK
By: _____ DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

PAULA CORBIN JONES                  :

              **Plaintiff,**     :    CIVIL ACTION

                                  :    NO. **LR-C-** 9 4 - 2 9 0

**v.**                              :

WILLIAM JEFFERSON CLINTON           :

   and                           :    **JURY TRIAL DEMANDED**

                                   :

DANNY FERGUSON                      This case assigned to District Judge _Wright_

             **Defendants.**     and to Magistrate Judge _Forster_

### COMPLAINT

Plaintiff Paula Corbin Jones, by counsel, brings this action to obtain redress for the deprivation and conspiracy to deprive Plaintiff of her federally protected rights as hereafter alleged, and for intentional infliction of emotional distress, and for defamation.

### JURISDICTION

1.   This Court has subject matter jurisdiction pursuant to (a) 28 U.S.C. §1331, because the case arises under the Constitution and laws of the United States; (b) 28 U.S.C. §1343, because this action seeks redress and damages for violation of 42 U.S.C. §§1983 and 1985 and, in particular, the due process and equal protection provisions of the United States Constitution, including the rights protected in the Fifth and Fourteenth Amendments thereof; and (c) 28 U.S.C. §1232, since there is diversity of citizenship and this is a civil action involving, exclusive of interest and costs, a sum in excess of $50,000.00.  This Court also has jurisdiction over the causes of action alleged in Counts III and IV pursuant to federal pendant jurisdiction.

1

## VENUE

2.    Venue is appropriate in this judicial district under 28 U.S.C. §1391(b), because Defendants William Jefferson Clinton and Danny Ferguson reside here, and a substantial part of the events giving rise to this Complaint occurred here.

## THE PARTIES

3.    Plaintiff Paula Corbin Jones (hereafter "Jones") is a citizen of the State of California.    Prior to her marriage on December 28, 1991, Plaintiff was known as Paula Rosalee Corbin.

4.    Defendant William Jefferson Clinton (hereafter "Clinton") is a citizen of the State of Arkansas or alternatively of the District of Columbia.

5.    Defendant Danny Ferguson (hereafter "Ferguson") is a citizen of the State of Arkansas.

## FACTS

6.    On or about March 11, 1991, Jones began work as an Arkansas State employee for the Arkansas Industrial Development Commission (hereafter "AIDC"), an agency within the executive branch of the State of Arkansas.   The Governor of Arkansas is the chief executive officer of the executive branch of the State of Arkansas.

7.    On May 8, 1991, the AIDC sponsored the Third Annual Governor's Quality Management Conference (hereafter "Conference"), which was held at the Excelsior Hotel in Little Rock, Arkansas. Clinton, then Governor of Arkansas, delivered a speech at the Conference on that day.

2

8.   Also on that day, Jones worked at the registration desk at the Conference along with Pamela Blackard (hereafter "Blackard") another AIDC employee.

9.   A man approached the registration desk and informed Jones and Blackard that he was Trooper Danny Ferguson, Bill Clinton's bodyguard.  Defendant Ferguson was at that time a law enforcement officer within the ranks of the Arkansas State Police and assigned to the Governor's Security Detail.  He was in street clothes and displayed a firearm on his person.  He made small talk with Jones and Blackard and then left.

10.   At approximately 2:30 p.m. on that day, Ferguson reappeared at the registration desk, delivered a piece of paper to Jones with a four digit number written on it and said: "The Governor would like to meet with you" in this suite number. Plaintiff had never met Defendant Clinton and saw him in person for the first time at the Conference.

11.   A three-way conversation followed between Ferguson, Blackard and Jones about what the Governor could want.  Jones, who was then a rank-and-file Arkansas state employee being paid approximately $6.35 an hour, thought it was an honor to be asked to meet the Governor.  Ferguson stated during the conversation: "It's okay, we do this all the time for the Governor."

12.   Jones agreed to meet with the Governor because she thought it might lead to an enhanced employment opportunity with the State.   Blackard told Jones that she would assume Plaintiff's duties at the registration desk.

3

13.   Trooper Ferguson then escorted Jones to the floor of the hotel suite whose number had been written on the slip of paper Trooper Ferguson had given to Jones.  The door was slightly ajar when she arrived at the suite.

14.   Jones knocked on the door frame and Clinton answered. Plaintiff entered.  Ferguson remained outside.

15.   The room was furnished as a business suite, not for an overnight hotel guest.  It contained a couch and chairs, but no bed.

16.   Clinton shook Jones' hand, invited her in, and closed the door.

17.   A few minutes of small talk ensued, which included asking Jones about her job. Clinton told Jones that Dave Harrington is "my good friend."  On May 8, 1991, David Harrington was Director of the AIDC, having been appointed to that post by Governor Clinton. Harrington was Jones' ultimate superior within the AIDC.

18.   Clinton then took Jones' hand and pulled her toward him, so that their bodies were in close proximity.

19.   Jones removed her hand from his and retreated several feet.

20.   However, Clinton approached Jones again.  He said: "I love the way your hair flows down your back" and "I love your curves."  While saying these things, Clinton put his hand on Plaintiff's leg and started sliding it toward the hem of Plaintiff's culottes.  Clinton also bent down to attempt to kiss Jones on the neck.

4

21.   Jones exclaimed, "What are you doing?" and escaped from Clinton's physical proximity by walking away from him. Jones tried to distract Clinton by chatting with him about his wife. Jones later took a seat at the end of the sofa nearest the door. Clinton asked Jones: "Are you married?" She responded that she had a regular boyfriend. Clinton then approached the sofa and as he sat down he lowered his trousers and underwear exposing his erect penis and asked Jones to "kiss it."

22.   There were distinguishing characteristics in Clinton's genital area that were obvious to Jones.

23.   Jones became horrified, jumped up from the couch, stated that she was "not that kind of girl" and said: "Look, I've got to go." She attempted to explain that she would get in trouble for being away from the registration desk.

24.   Clinton, while fondling his penis said: "Well, I don't want to make you do anything you don't want to do." Clinton then stood up and pulled up his pants and said: "If you get in trouble for leaving work, have Dave call me immediately and I'll take care of it." As Jones left the room Clinton looked sternly at Jones and said: "You are smart. Let's keep this between ourselves."

25.   Jones believed "Dave" to be the same David Harrington, of whom Clinton previously referred. Clinton, by his comments about Harrington to Jones, affirmed that he had control over Jones' employment, and that he was willing to use that power. Jones became fearful that her refusal to succumb to Clinton's advances could damage her in her job and even jeopardize her employment.

5

26. At no time, nor in any manner, did Jones encourage Clinton to turn the meeting toward a sexual liaison. To the contrary, the unwanted sexual advances made by Clinton were repugnant and abhorrent to Jones who took all reasonable steps she could think to do to terminate Clinton's perverse attention and actions toward her.

27. Jones left the hotel suite and came into the presence of Trooper Ferguson in the hallway. Ferguson did not escort Plaintiff back to the registration desk. Jones said nothing to Ferguson and he said nothing to her during her departure from the suite.

28. Jones was visibly shaken and upset when she returned to the registration desk. Pamela Blackard immediately asked her what was wrong. After a moment, during which Jones attempted to collect herself, she told Blackard much of what had happened. Blackard attempted to comfort Plaintiff.

29. Jones thereafter left the Conference and went to the work place of her friend, Debra Ballentine.

30. When Ballentine met Plaintiff at the reception area, she immediately asked Jones what was wrong because Jones was visibly upset and nervous. Plaintiff wanted to talk about something that just happened and wanted to discuss it someplace privately. Ballentine and Jones went to a private area in the office, and later outside. Jones then told Ballentine what had happened with Clinton in the hotel suite. According to Ballentine, Jones told her that Clinton said as she left the room, "I know you're a smart girl and I'm sure you'll keep this to yourself."

6

31.  Ballentine urged Jones to report the incident.  Plaintiff refused, fearing that, if she did so, no one would believe her account, that she would lose her job, and that the incident would endanger her relationship with her then-fiance (now husband), Stephen Jones.

32.  Later, on the same day, Plaintiff also described the substance of her encounter with Clinton to her sister, Charlotte Corbin Brown.

33.  Within two days of May 8, 1991, Plaintiff also informed her sister, Lydia Corbin Cathey, and her mother, Delmar Lee Corbin, the substance of her encounter with Clinton.

34.  Plaintiff also told her fiance, Stephen Jones, that "Bill Clinton made a pass at me but I said 'no'."  She, however, did not at that time tell him the lurid details of her horrific encounter with Clinton in the hotel suite, which she feared, if disclosed, might ruin her relationship with Mr. Jones.

35.  Plaintiff continued to work at AIDC.  One of her duties was to deliver documents to and from the Office of the Governor, as well as other offices within the Arkansas State Capitol complex. In or about June, 1991, while Jones was performing this duty, Ferguson saw her at the Governor's office and said: "Bill wants your phone number.  Hillary's out of town often and Bill would like to see you."   Plaintiff refused to provide her telephone number.

36.   On another occasion, Ferguson approached Jones and asked: "How's Steve?" This frightened Plaintiff and made her feel as if she was being watched and was not safe. She had never told Ferguson or Clinton the name of her fiance.

37.   Plaintiff and Stephen Jones later married. She gave birth to her child and returned to work, after which she encountered Ferguson at Governor Clinton's office. Ferguson told her: "I've told Bill how good looking you are since you've had the baby." This, too, frightened Plaintiff and made her feel that her activities were being monitored.

38.   On one occasion, Plaintiff was accosted by Clinton in the Rotunda of the Arkansas State Capitol. Clinton draped his arm over Plaintiff, pulled her close and tightly to his body and said: "Don't we make a beautiful couple -- beauty and the beast?" Clinton directed this remark to his bodyguard, Trooper Larry Patterson, an officer of the Arkansas State Police and also a member of the Governor's Security Detail.

39.   Jones continued to work at AIDC even though she was in constant fear that Governor Clinton might take retaliatory action against her because of her rejection of his abhorrent sexual advances. Her enjoyment of her work was severely diminished. In fact, she was treated in a hostile and rude manner by certain superiors in AIDC. This rude conduct had not happened prior to her encounter with Clinton. Further, after her maternity leave she was transferred to a position which had no responsible duties for which she could be adequately evaluated to earn advancement. The reason

8

given to her by her superiors for the transfer was that her previous position had been eliminated. This reason was untrue since her former position was not abolished. It was a pretext for the real reason which was that she was being punished for her rejection of the various advances made by Clinton described above. In addition, the job in which she was placed called for a higher grade and pay, yet she was not paid more money than she received in her previous position. Although other employees received merit increases, Jones never received a raise beyond a cost of living increase.

40. Jones terminated her employment and separated from AIDC service on February 20, 1993. On May 4, 1993, Plaintiff, her husband and child moved to California.

41. In January, 1994, Plaintiff visited her family and friends in Arkansas. While Jones was in Arkansas, Ms. Ballentine telephoned Jones to arrange a meeting for lunch. During the telephone conversation, Ballentine read to Plaintiff a paragraph from an article published in the January, 1994 issue of The American Spectator magazine regarding Plaintiff's hotel suite encounter with Clinton. Attached hereto, and incorporated herein, as Exhibit "A" is a copy of The American Spectator article.

42. The American Spectator account asserts that a woman by the name of "Paula" told an unnamed trooper (obviously Defendant Ferguson), who had escorted "Paula" to Clinton's hotel room, that "she was available to be Clinton's regular girlfriend if he so desired," thus implying a consummated and satisfying sexual

encounter with Clinton, as well as a willingness to continue a sexual relationship with him.  These assertions are untrue.  The article, using information apparently derived from Ferguson, also incorrectly asserts that the encounter took place in the evening.

43.  The American Spectator account also asserted that the troopers' "'official' duties included facilitating Clinton's cheating on his wife.  This meant that, on the State payroll, and using State time, vehicles and resources, they were instructed by Clinton on a regular basis to approach women and to solicit their telephone numbers for the Governor, to drive him in State vehicles to rendezvous points and guard him during sexual encounters; to secure hotel rooms and other meeting places for sex; ..." and various other things to facilitate Clinton's sex life including "to help Clinton cover-up his activities by keeping tabs on Hillary's whereabouts and lying to Hillary about her husband's whereabouts." Although this pattern of conduct by Clinton may be true, the magazine article concluded, evidently from interviews with troopers from Clinton's Security Detail, including Ferguson, that "all of the women appear to have been willing participants in the affairs and liaisons [emphasis added]."

44.  Since Jones ("Paula") was one of the women preyed upon by Clinton and his troopers, including by Defendant Ferguson, in the manner described above, those who read this magazine account could conclude falsely that Jones ("Paula") had a sexual relationship and affair with Clinton.  Jones' reputation within her community was thus seriously damaged.

45.   Jones realized that those persons who already knew about the hotel room encounter could identify her as the "Paula" mentioned in The American Spectator article.  She became extremely upset because, inter alia, she feared that the statements in the magazine would damage her relationship with her husband, her family, and her friends and acquaintances, some of whom might have believed that she had agreed to be Clinton's "girlfriend" at a time when she was engaged to Mr. Jones.

46.   On January 8, 1994, at approximately 12:00 noon, Jones and Ballentine were dining at the Golden Corral Steakhouse in North Little Rock, Arkansas.  Trooper Ferguson, who happened to be dining with his wife at this restaurant, came over to their table to talk to Jones.  Since Jones believed that the ultimate source of the report in The American Spectator of the hotel suite encounter was Trooper Ferguson, she confronted him on this matter.  Trooper Ferguson stated that he was sorry that Jones' first name had appeared in the magazine article but that he had purposely concealed her last name and place of employment from those to whom he recounted the incident.  Trooper Ferguson also said that he knew Jones had rebuffed Mr. Clinton's sexual advances because, "Clinton told me you wouldn't do anything anyway, Paula."

47.   Because the false statements appearing in The American Spectator article that Jones was willing to have sex with Clinton (and the innuendo that she had already done so when she left the hotel suite) threatened her marriage, her friendships, and her family relationships, Plaintiff spoke publicly on February 11,

11

1994, that she was the "Paula" mentioned in <u>The American Spectator</u> article, that she had rebuffed Clinton's sexual advances, and that she had not expressed a willingness to be his girlfriend. Jones and her lawyer asked that Clinton acknowledge the incident, state that Jones had rejected Clinton's advances, and apologize to Jones.

48.   Clinton, who is now President of the United States of America responded to Jones' request for an apology by having his press spokespersons deliver a statement on his behalf that the incident never happened, and that he never met Plaintiff. Thus, by innuendo and effect, Clinton publicly branded Plaintiff a liar. Moreover, as recently as the week this Complaint was filed, Clinton, through his White House aides, stated that Plaintiff's account of the hotel room incident was untrue and a "cheap political trick."

49.   Clinton hired an attorney, who, as Clinton's agent, said that Jones' account "is really just another effort to rewrite the results of the election [<u>i.e.</u> for President of the United States] and ... distract the President from his agenda." The attorney further asked the question:   "Why are these claims being brought now, three years after the fact?"   The attorney also asked how Jones' allegations could be taken "seriously."   These comments by Clinton's counsel, on behalf of Clinton, imply that Jones is a liar.

50.   Dee Dee Meyers, White House Spokeswoman, said of Jones' allegations:   "It's just not true."   Thus, the pattern of defaming Jones continues to this date.

12

51. Clinton knows that Jones' allegations are true and that his, and his attorney's, spokespersons', and agents' denials are false.

52. The outrageous nature of Clinton's branding of Jones as a liar is aggravated in that a greater stigma and reputation loss is suffered by Jones by the statements of the President of the United States in whom the general public reposes trust and confidence in the integrity of the holder of that office.

53. Clinton, a member of the Arkansas State Bar, knew or should have known on May 8, 1991, and thereafter, that Arkansas law provides that harassment, including the touching or attempt or threat to do so which subjects the victim to offensive or potentially offensive physical contact, is a criminal violation of Arkansas Code Annotated 5-71-208.

54. While Jones was in Clinton's hotel suite, Jones was falsely imprisoned by Clinton's intentional restriction of her personal freedom of movement without legal right. Clinton's use of force in pulling Jones toward him, his words and acts, and the armed police guard outside the door, in conjunction with the impressive atmosphere of her being alone with the Governor of the State who was also her superior's boss, caused her to be initially and temporarily afraid to terminate the meeting.

55. The statements, acts, and omissions of Clinton's agents, servants, and employees who acted under his explicit and implicit instructions and supervision, during the pertinent periods herein when he was Governor of Arkansas, and after he became President,

bind Clinton under the doctrines of agency, joint conduct, master-servant, _respondeat superior_, and conspiracy.

56. The actions of the Arkansas state employees, including Defendant Ferguson and other agents of Clinton were taken under color of state law.

57. Clinton's actions and omissions above stated caused Jones embarrassment, humiliation, fear, emotional distress, horror, grief, shame, marital discord and loss of reputation.


## COUNT I

### DEPRIVATION OF CONSTITUTIONAL RIGHTS AND PRIVILEGES
### (42 U.S.C. §1983)

58. Plaintiff incorporates by reference paragraphs 1 through 57.

59. Plaintiff is entitled to the equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and due process of law under the Fifth and Fourteenth Amendments of the United States Constitution.

60. Defendant Clinton, as Governor of Arkansas, acting under color of state law, discriminated against Plaintiff because of her gender by sexually harassing and assaulting her on May 8, 1991, and thereafter, and this deprived Jones of her right to equal protection of the law.

61. Further, he continued personally, and through agents, to impose a hostile work environment on Plaintiff in which she feared the loss of her employment and the possible adverse employment

14

actions against her, including job discrimination and monitoring of her personal life. As described above she was placed in a category separate from other public employees in that she was actually subjected to hostility by her superiors, which deprived her of an opportunity for advancement and she suffered an economic depravation.

62. Plaintiff, as a citizen and Arkansas state employee, was entitled to due process protection of freedom from arbitrary action which jeopardized her property interest in her public employee job in that she should not have been subjected arbitrarily to the fear of losing that job or of having to provide sex to the Governor as a _quid pro quo_ for keeping the job. Further, she should not have been subjected arbitrarily to the fear of losing the enjoyment of a proper and pleasant work environment, or to other adverse actions which she feared and which deprived her of the proper enjoyment and efficiency of her work. Clinton's actions deprived Jones of her due process liberty and property interests guaranteed to her by the Constitution of the United States.

63. Plaintiff also was entitled to a due process liberty interest in her reputation as an honest public employee. Clinton's actions and statements deprived Jones of these rights.

64. Plaintiff, for a brief period of time, was held against her will by the oppressive atmosphere of intimidation caused by the presence of the highest official of the State of Arkansas and an armed guard at the door. Not only was she subjected to unwelcome sexual advances, but also was personally restrained and imprisoned

by the seizing of her person, against her will, by Clinton and his agent.

65.   The above-described actions of Clinton were undertaken when he was acting under the color of state law, as Governor of Arkansas, and said actions deprived Jones of federal equal protection and due process rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, and made actionable by 42 U.S.C. § 1983 (The Civil Rights Act).

## COUNT II

### CONSPIRACY TO DEPRIVING PERSONS OF EQUAL PROTECTION OF THE LAWS
### (42 U.S.C. § 1985)

66.   Plaintiff incorporates by reference paragraphs 1 through 65.

67.   Clinton conspired with his Security Detail, including with Defendant Ferguson, and perhaps with others currently unknown to this Plaintiff, to deprive Jones of equal protection of the laws and of equal privileges and immunities under the laws, as further set forth in Count I above.

68.   The conspirators committed some acts in furtherance of the conspiracy which included contacting Jones and bringing her to Clinton on May 8, 1991 to permit him to attempt to entice her on to have a sexual liaison with him.

69.   As a result of the conspiracy, Jones was injured by Defendants in her person and property and deprived of having and exercising her rights and privileges as a citizen of the United States, as is more fully set forth in Count I.

## COUNT III

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

70.  Plaintiff incorporates by reference paragraphs 1 through 69.

71.  The conduct of Clinton herein set forth was odious, perverse and outrageous.  Not only were the acts of sexual perversity unwelcome by Jones, but they were wilful, wanton, reckless, intentional, persistent and continuous in the hotel room.

72.  Clinton's sexual advances, assaults upon and imprisonment of Jones' person, and his exposure of his erect penis and his requests of acts to be performed thereupon were extreme, intentional, and caused Jones severe emotional distress.

73.  Not content with the events in the hotel on May 8, 1991, Clinton on subsequent occasions, acting himself and through his agents, as specified above, aggravated further the initial severe emotional damage to Jones.

74.  These actions were so outrageous in character, and extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

## COUNT IV

### DEFAMATION

75.  Plaintiff incorporates by reference paragraphs 1 through 74.

17

76. On several occasions on and after February 11, 1994, Clinton, and his agents and employees acting pursuant to his direction, maliciously and wilfully, defamed Jones by making statements which Clinton knew to be false. These statements were made with the intent and certain knowledge that they would be reprinted in the print and other media.

77. Such statements by Clinton, his agents and employees, characterized Jones as a liar and as being "pathetic," and damaged her good name, character, and reputation.

78. Defendant Ferguson's statements likewise maliciously and willfully defamed plaintiff and damaged her good name, character and reputation. Ferguson's statement that Jones had agreed to be Clinton's girlfriend, and his innuendo that she had willingly participated in a sexual encounter, were knowingly false.

79. That Ferguson knew these statements were false is confirmed by Clinton's denial to Ferguson that anything happened of a sexual nature between Clinton and Jones.

<u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiff requests the following relief:

a. <u>Count I</u>, judgment against Defendant Clinton for compensatory damages of $ 75,000.00; punitive damages for Defendant's wilful, outrageous and malicious conduct, of $100,000.00; the costs of her suit and attorneys' fees; nominal damages, and such other and further relief as the Court may deem proper.

b. <u>Count II</u>, judgment against Defendant Clinton and

Defendant Ferguson, jointly and severally for compensatory damages of $ 75,000.00; punitive damages for Defendant's wilful, outrageous and malicious conduct, of $ 100,000.00; the costs of her suit and attorney's fees; nominal damages, and such other and further relief as the Court may deem proper.

c.   Count III, judgment against Defendant Clinton for compensatory damages of $ 75,000.00; punitive damages for Defendant's wilful, outrageous and malicious statements and conduct, of $ 100,000.00; the costs of her suit and attorneys' fees; nominal damages, and such other and further relief as the Court may deem proper.

d.   Count IV, judgment against Defendant Clinton and Defendant Ferguson, jointly and severally for compensatory damages of $ 75,000.00; punitive damages for Defendant's wilful, outrageous and malicious statements and conduct, of $ 100,000.00; the costs of her suit and attorneys' fees; nominal damages, and such other and further relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on each of the counts.

Respectfully Submitted,

PAULA CORBIN JONES
By Her Counsel

Gilbert K. Davis, VA Bar No. 4683
Attorney for Plantiff
9516-C Lee Highway
Fairfax, Virginia  22031
(703) 352-3850

and

Joseph Cammarata, VA Bar No. 35118
Attorney for Plaintiff
9516-C Lee Highway
Fairfax, Virginia  22031
(703) 352-3850

## VERIFICATION

I hereby certify under penalty of perjury that I am the
Plaintiff in the above-captioned case; that I have read the
foregoing Complaint; and, that the facts related therein are true
and correct to the best of my knowledge, information, and belief.

Paula Corbin Jones

**Ben Stein: Requiem for a Madam • Shalala's Shenanigans**

# THE AMERICAN
# SPECTATOR
®

JANUARY 1994 | A MONTHLY REVIEW EDITED BY R. EMMETT TYRRELL, JR.

# His Cheatin' Heart
## David Brock in Little Rock



EXHIBIT
PLAINTIFF'S
EXHIBIT
A



## Maurice Cranston, RIP

## Hell of a Podhoretz



U.S. $2.95
CANADA $3.95

0  73361 64590  6

0 1



# Living With the Clintons

*Bill's Arkansas bodyguards tell the story the press missed.*

by David Brock

## I



In a remarkable but little-noticed article buried inside the Sunday *Washington Post* four months before the 1992 presidential election, top Clinton campaign aide Betsey Wright said she had been spending the better part of her time since the Democratic National Convention trying to quell potential "bimbo eruptions."

Through the Little Rock gossip mills, the campaign was tracking nineteen potential allegations that had surfaced in the first week following the convention, in addition to seven others that had appeared earlier in the year, Wright said. The extensive effort to short-circuit such stories, Wright said, included the campaign's hiring of a private investigator to obtain information damaging to the credibility of the women involved, which was then used, presumably, to persuade them to stay quiet.

Perhaps unintentionally, the phrase "bimbo eruptions" cut two ways. Wright's choice of the epithet "bimbo"—and a later reference to "gold-digger growth"—was obviously meant to discredit in advance any reports of sexual liaisons between Arkansas governor Bill Clinton and women other than his wife, Hillary. Yet at the same time, Wright also seemed to be conceding, if not promising, that there was more to come—i.e., the imminent appearance of an unspecified number of such women, and a subsequent round of stories raising questions about Clinton's private life.

Wright was not the first to talk about the campaign's aggressive efforts to discredit sources and lobby reporters and editors to spike emerging news stories. Writing in the *New York Times* in March, Gwen Ifill reported:

*David Brock is the author of* The Real Anita Hill *(Free Press) and an investigative writer for* The American Spectator.

There have been constant, though undocumented, reports of articles that were never published because the Clinton damage controllers were on full alert before final publication decisions were made. This works "more often than you think," said George Stephanopoulos.

Even the recently released documentary about the 1992 campaign, *The War Room*, showed Stephanopoulos on the telephone on the eve of the election, warning a caller not to go public with damaging information about Clinton's private life.

The campaign had gone on "full alert" when Gennifer Flowers, the former cabaret singer, alleged in an interview with the *Star* supermarket tabloid that she had carried on a 12-year affair with Clinton ("Mistress Tells All, The Secret Love Tapes That Prove It"). With Hillary at his side, Clinton appeared on "60 Minutes" to deny that he had ever had an affair with Flowers, calling her only "a friendly acquaintance," but acknowledging unspecified "wrongdoing" and "causing pain in my marriage."

Flowers's story was tainted at the outset, when she was reportedly paid $150,000 to cooperate with a publication of no journalistic repute. It was then discovered by the *Arkansas Democrat-Gazette* that she had misrepresented parts of her educational background and work history. Writing in the *New Republic*, Sidney Blumenthal described Flowers as "the woman in red, trimmed in black to match the roots of her frosted hair."

On the other hand, there was direct evidence weighing in favor of Flowers. Though they had some unexplained pauses and ambiguous references, Flowers had tapes of conversations with Clinton, including his instruction that she deny that they had talked about her obtaining a state job ("If they ever ask you if you've talked to me about it, you can say no"). She also had corroboration for her story from her mother Mary, as well as from her roommate at the time, Lauren Kirk, who declared in an interview with the *New York Post*'s Cindy Adams, "There can be no doubt that she and Bill Clinton had sex with one another."[1] And finally, Clinton never denied the authenticity of the tapes; in fact, he apologized to Mario Cuomo for a taped remark imputing Mafia ties to the New York governor.

Yet with very few exceptions—Phil Donahue and the *Washington Monthly*'s Charles Peters among them—the press was untroubled by these wrinkles in Clinton's denial of the Flowers affair and accepted his suggestion that any marital indiscretions were history. Pressed by Donahue, Clinton seemed to assert that any peccadilloes were a thing of the past: "I've told you the only facts I think you're entitled to know. Have I had any problems with my marriage? Yes. Are we in good shape now? Yes." The contention that any marital infidelity was no longer occurring was crucial to Clinton's ability to put out the fire. As the *New York Times* paraphrased Clinton pollster Stan Greenberg at the time, "As long as voters believed the candidate had not lied and that his marriage was 'real,' they will not turn on him."

For the most part, the press coverage quickly devolved into a tortured colloquium on whether or not infidelity was a Legitimate Issue. To the extent that members of the press corps had come to believe that it no longer was, that they had gone too far in destroying Democratic front-runner Gary Hart's political career by exposing his ties to model Donna Rice in 1987, Clinton may have been treated with kid gloves on the womanizing issue. Though opinion polls showed that 14 percent of the electorate would not vote for an adulterer, the indifferent public response to the Flowers story may have convinced many in the media that the public desire for "change" outweighed any concerns about Clinton's character. In addition, it was clear that many reporters viewed Clinton as "one of us," a product of the 1960s not only politically, but on sexual matters as well—a "liberal semi-hip contemporary who seems to share their [reporters'] values," as the *Boston Globe* described the candidate. Clinton booster Eleanor Clift of *Newsweek* candidly stated after the Flowers revelations, "Truth is, the press is willing to cut Clinton some slack because they like him and what he has to say."

Nonetheless, a competing if minority view among some journalists held that the press must not repeat the slavish self-censorship of the Kennedy days. Surely a number of news organizations continued to scrutinize Clinton's private life after the Flowers story faded, and even more so following his presidential nomination. Despite Clinton's tacit admission of infidelity, however, after Flowers no other "bimbos" erupted.[2]

Having recently spent a good deal of time in Arkansas with people who were close to the Clintons in their Little Rock years, I'm fairly certain that it was less a lack of professional interest in the subject, and more the lack of on-the-record sourcing due to the strong-arm tactics acknowledged by Wright and Stephanopoulos, that kept what could have been one of the biggest political stories of the campaign from seeing the light of day.

## II

Much has been written of Clinton's fascination with JFK, dating back to the time he was introduced to the president while visiting Washington as a teenager in 1963. When Clinton returned from Washington, he announced to his mother that he was going to enter politics. This past September, President Clinton

---

[1] After speaking to the press, Kirk was fired from her job as a realtor in Dallas.

[2] Other names surfaced in the tabloids but, unlike Flowers, were never mentioned in the mainstream press. Appearing on the Sally Jesse Raphael show in July 1992, Sally Perdue, a former Miss Arkansas, claimed that she had had an affair with Clinton, but the media generally did not report this. After the appearance, Perdue was fired from her job in the admissions office of a Midwestern university. A second woman had actually surfaced prior to Flowers, in *Penthouse*. Connie Hamzy of Little Rock said she had been sunbathing by a pool at a hotel in North Little Rock in August 1984 when an aide to Clinton approached her and arranged a sexual encounter with Clinton.

summoned journalist Richard Reeves, the author of the recent biography *President Kennedy*, to the White House to discuss his book. Reeves writes of how Kennedy and his handlers worked hard to keep stories of the president's womanizing out of the papers, much as the Clinton campaign would do some thirty years later:

> [Kennedy] understood an important fact about the press and scandal: respectable journals generally avoided being the first to report on rumors or evidence concerning sex. But he knew that once something had been printed, no matter where, newspapers and magazines quickly quoted each other, using the first publication as a peg for their own reports. . . . The idea was to stop the first mention.

Clinton followed his idol's strategy, and thus far he's been amazingly successful. On the Flowers tapes, Clinton is heard saying, "They can't run a story like this unless somebody said, 'Yeah, I did it with him.'" Given the way Flowers was made an example of by Wright, Blumenthal, and others, women who have been linked to Clinton were less likely to come forward. But aside from the women, there was another group of sources sought after by reporters in the fall of 1992 because they were uniquely positioned to have first-hand knowledge of the subject: the dozen or so Arkansas state police officers assigned to the governor's security detail both before and during the presidential run.

Under state law, these troopers are charged with safeguarding the first family of Arkansas, as well as the grounds of the gubernatorial mansion in downtown Little Rock. In practice, at least during the six terms that Clinton held office, the troopers functioned as chauffeurs, butlers, bodyguards, errand boys, and baggage handlers. They did everything for the Clintons, from receiving and placing telephone calls to changing bicycle tires and cleaning up after Socks the cat (who apparently retches with alarming frequency).

In late August and in September and October, I spent more than thirty hours interviewing four state troopers who had worked for the Clintons at various times over the years; in total, their experience covered most of the period from early 1979, when Clinton first took office, to January 16, 1993, when Clinton left Little Rock and flew east for his presidential inauguration. The meetings took place after I received an unsolicited tip that a group of Arkansas troopers was considering coming forward to tell all they knew about the Clintons, including extensive first-hand information about Bill's philandering.

The troopers' proximity to the Clintons had prompted reporters from many national news organizations to seek them out for interviews in 1992, calling them at all hours of the day and night for weeks. Up until last fall, when I interviewed them, they had not talked. I spoke with the troopers separately and in various combinations and then re-interviewed them several times on tape to test and re-test their account for inconsistencies and embellishment.

Ultimately, two of the troopers, Larry Patterson and Roger Perry, decided to go on the record with the material and allow their names to be used in this piece. At that point, they retained two lawyers: Cliff Jackson, a former Oxford

classmate of Clinton's, who had accused Clinton of lying about his draft history in a series of media interviews in 1992; and Lynn Davis, a former director of the Arkansas state police and a former prosecutor.[3]

The troopers also spoke on the record and swore to affidavits furnished to the *Los Angeles Times*, which may make use of some of the material for a broader piece being developed on how the Clinton campaign kept these and similar stories from surfacing in 1992. The other two troopers have decided against going public at this time; their recollections are included here only if what they related to me in our off-the-record interviews corresponds with specific experiences they confided contemporaneously to one or both of the on-the-record troopers.

The troopers seem to have mixed motives. They say they are moved by public-spiritedness. They have come forward now because they believe the reckless personal behavior and poor judgment they witnessed by then-governor Clinton, if continued by the president, a subject on which they cannot speak authoritatively, could constitute a risk to the national security of the U.S. by making the president easy prey for blackmailers.

But as with all sources, there is also an element of self-interest and score-settling in their decision to speak to the media. As the troopers see it, Clinton behaved ungratefully and even rudely toward them after election day. "We lied for him and helped him cheat on his wife, and he treated us like dogs," Patterson said. When one of the troopers asked Clinton to sign some photographs for his family after the election, he said the president-elect snapped: "I don't have time for that s---." Clinton assured Patterson that he would secure for him a lateral transfer within the state police organization before leaving office, but he never found five minutes to make the telephone call. (The current governor, Jim Guy Tucker, later did.)

There is also a prospective financial interest. Patterson, 47, the articulate senior member of the group, with twenty-seven years of service in the state police, and Perry, 43, with sixteen years of service, hope to collaborate on a book about life at the governor's mansion. Perry, who worked for Clinton in his first term, returned to duty at the governor's mansion in 1989 and remains on Tucker's detail. Patterson had worked for Clinton on several special assignments

---

[3] The process of getting the material from Patterson and Perry on the record was a long one. In October we signed a written agreement authorizing me to publish this piece in this magazine while protecting their right to sell a book later. So great was their fear of retaliation from what they called "the Clinton machine," that the troopers then had Jackson make inquiries about establishing a defense fund to cover potential legal costs and lost income that could result from coming forward. In early December, however, the troopers decided to go on the record with no such protection, in order to guard against the potential criticism that they had been induced to talk for money. To allay my own concerns on this issue, I requested and received written assurance from Jackson prior to publication that no money had been paid or promised to his clients by anyone for disclosing any information.

before assuming full-time duties in 1987. They both served Clinton until his last day as governor in 1993.

The experiences of Patterson and Perry, only a selection of which will be described here, show that, in addition to lying to the American public when he denied his relationship with Gennifer Flowers and claimed that any infidelity had occurred only earlier in his marriage, Clinton had an elaborate damage-control operation that was reminiscent of John Kennedy's—and for a very good reason: For at least a decade, Clinton has been prone to extramarital affairs, often more than one at a time, and to numerous one-night stands. According to the troopers, the clandestine sexual encounters occurred even after the presidential election and continued through Clinton's final days in Little Rock.



Clinton is a man of gargantuan appetites and enormous drive, and not only in relation to women. "When he would eat an apple," said Roger Perry, a stout 6'2" chain-smoker who does not seem easily offended, "he would eat the whole thing, core, stem, and seeds. He would pick up a baked potato with his hands and eat it in two bites. I've never seen anything like it."

The troopers said their "official" duties included facilitating Clinton's cheating on his wife. This meant that, on the state payroll and using state time, vehicles, and resources, they were instructed by Clinton on a regular basis to approach women and to solicit their telephone numbers for the governor; to drive him in state vehicles to rendezvous points and guard him during sexual encounters; to secure hotel rooms and other meeting places for sex; to lend Clinton their state cars so he could slip away and visit women unnoticed; to deliver gifts from Clinton to various women (some of whom, like Flowers, also had state jobs); and to help Clinton cover up his activities by keeping tabs on Hillary's whereabouts and lying to Hillary about her husband's whereabouts.

How important such revelations are in any assessment of Bill Clinton as a man, and as a political leader, can be left for the reader's judgment. The *Newsweek* reviewer of the Reeves book identified the dilemma for journalists and historians:

Kennedy scholars have by now proved that his private life was less than admirable. He was a compulsive womanizer and, like most such men and many presidents, an accomplished liar. A biographer has to decide how far to interpret Kennedy's public performance as president through the medium of his private foibles.

Surely, it is nothing new that many politicians use their positions to solicit sexual favors and come to believe that the laws and mores that govern others don't apply to them. So far as the troopers knew, Clinton's activities did not include abuse of drugs or alcohol, and all of the women appear to have been willing participants in the affairs and liaisons. Some may well conclude, therefore, that Bill and Hillary Clinton's loose sexual morals and their habitual foul language are irrelevant to their public roles and, in any event, are not uncharacteristic of their generation as a whole.

Still, the Clintons hold positions that, it is possible to argue, ought to be subject to a higher standard, particularly for people so inclined to argue for their public policies in a moral context. While rumors of extramarital dalliances have surrounded many presidents in this century, the scale of Clinton's past indiscretions, if it has been sustained in the White House, as has been widely rumored, would appear to far exceed that of any of his predecessors, with the possible exception of John Kennedy. If, as the troopers describe it, he is a sexual predator and exploiter of women, his behavior may be more egregious than that which destroyed the political careers and reputations of Gary Hart, John Tower, and most recently Bob Packwood.

### III

But there is a larger point in the case of Clinton that goes well beyond any moral or ethical judgment about—or prurient interest in—his private life. When sources come forward of their own volition to describe how Clinton's private activities have caused lies to be told, threats to be made, and cover-ups to be undertaken, an issue of public integrity is raised, and the public's right to know outweighs a public figure's claim to privacy or journalistic discretion. Thus, even if one is inclined to give the issues of character, judgment, and self-control raised by the troopers' account of Clinton's behavior little weight—much of the material should strike readers as more farcical than scandalous, a view shared by the troopers, who chuckled through some of the telling—it became evident in the reporting of this story that Clinton and his surrogates continue to regard his private behavior as a political time bomb. Their effort to try to thwart publication of the story is itself newsworthy—and quite illustrative of how this information was kept from voters during the 1992 campaign.

Shortly after my first session with the troopers, three of the

four (Perry and the two who wished to remain off the record) received telephone calls from their former supervisor on the governor's security detail, Captain Raymond L. "Buddy" Young, who last July was named by Clinton to head a regional Federal Emergency Management Agency office in Texas. Perry said Young told him that he was aware that they had hired lawyers and were thinking of going public with a book or a story. Perry said that Young told him, "I represent the president of the United States. Why do you want to destroy him over this? You don't know anything anyway. . . . This is not a threat, but I wanted you to know that your own actions could bring about dire consequences." Patterson said Young sent him a handwritten note expressing concern for Patterson's health.

In an interview, Young confirmed that he had been in contact with the three troopers to discuss this matter. "I called Roger as a friend, and I told him I thought this was wrong, it was unethical, and it was a disgrace to security people. But I never said I spoke for the president, because I don't." Young denied having been in contact with the president or anyone in the White House on this subject. Young also confirmed that he sent a note to Patterson about his health, but denied any implication that the note was a veiled threat. "Larry has heart problems, and I was concerned about his cholesterol," Young said.

He went on to say that the thrust of Patterson and Perry's account was not true and that I should look closely at their motives. "These boys made this up to sell a book and because they were mad that Clinton didn't give them promotions," he said.[4]

Young also confirmed that one of the two troopers who decided not to go on the record—but whom Young voluntarily named, Danny Ferguson—subsequently obtained part-time employment at a Little Rock company, National Safety Consultants, in which Young owns an interest. "I started this consulting service for safety training for truck drivers a few years back as a part-time deal. I own an interest, but I don't have anything to do with the operation. They subcontracted with Danny. But it had absolutely nothing to do with what we're talking about. It was totally unrelated." Young also confirmed that the second trooper interviewed by me who decided not to come forward—whom he also voluntarily named, Ronnie Anderson—had a part-time job at this same company that pre-dated our first meeting. The job provides several thousand dollars a year in supplemental income to Anderson, Young said.

Ferguson also confirmed the arrangement but denied that it was related to his having decided not to go on the record with his stories about the Clintons. "I talked to Buddy more than a year ago about this job. But when I started, it was Ronnie Anderson who arranged it. Buddy didn't even know about it until after I started. I started a month ago, and I only made $190 last month [November]. If I was going to do

something not to talk, it wouldn't be for that kind of money," Ferguson said.

Another attempt to suppress the story was allegedly made by Paul "Rocky" Wilmoth, a Clinton fundraiser and Arkansas bulk-oil dealer and distributor. According to Perry, Wilmoth recently stopped by the governor's residence and told two troopers who have not been involved with this story, Frank Tappin and Derrick Flowers, to convey to Perry and Patterson that they would be "destroyed" if they talked to the press. Wilmoth denied the story, as did Flowers. Tappin declined to comment.

Perry said that Ferguson told him that Clinton called him personally while he was on duty at the Arkansas governor's mansion on at least two occasions after our first interview. During the initial call, according to Perry, Clinton let it be known that he was willing to offer favors in return for the troopers' refusal to cooperate further. Clinton told Ferguson to tell Roger Perry that "Roger can have whatever he wants [not to talk]." In another call to Ferguson, Clinton asked what precisely Perry and Patterson were saying, Perry said. "If you tell me what stories Roger and Larry are telling, I can go in the back door and handle it and clean it up," Clinton allegedly said. Perry said that Ferguson told him that in the course of the conversations Clinton offered Ferguson a federal job—either as the U.S. marshal in Little Rock or as a regional FEMA director—explicitly in exchange for his help in thwarting publication of any stories. This could be a violation by Clinton of a criminal statute barring the solicitation of money or anything of value (in this case, information) in consideration for the promise of federal employment. Ferguson said, "I'm not going to confirm anything Roger is saying I said." Asked if he was denying receiving calls from Clinton, he said, "I've talked to a lawyer and I'm not denying it. No comment." (The White House did not return calls for this story.)

These rumblings from the Clinton machine notwithstanding, Perry and Patterson have hung tough and decided to be the first to pierce the shield of secrecy surrounding Clinton's indiscretions that has been so effectively maintained up to now. Readers should be forewarned about two aspects of their story. First, the many subjective observations and judgments made about the Clintons are the troopers' own and should be considered in the light of the troopers' inherent biases and limitations. That said, the unvarnished observations of these men warrant disclosure because they provide the kind of texture that would likely not be revealed until presidential biographies were published, years or decades after the Clintons left office. Second, the reader should be warned that when the troopers are describing events they witnessed and quoting verbatim statements made in their presence, much of what they have to say is vulgar tabloid fare. This, however, reflects not on them, but on the behavior of the first couple.

## IV

As the troopers saw it, the Clintons' relationship is an effective political partnership, more a business relationship than a marriage. They described Bill as the public face, the communicator, the conciliator, a man

---

[4] Young is currently being sued in Arkansas for allegedly lying in federal court to discredit a witness who claimed to have information about illegal drug money being funneled through the Arkansas bond market during Clinton's tenure.

who likes to be liked and even talked with them about his "star" qualities. "One time we got to talking while I was driving him back from a political event and he said, 'You know, I'm going to have to stay in politics now, because I'm too old to be a movie star,'" Patterson recalled.

The troopers charted a distinct change between the headstrong radical of Clinton's first term—"kind of a hippie," as Perry put it—and the chastened compromiser of later years. Rejection by the voters in 1980 left Clinton with a propensity to try to please all sides, therefore often pleasing none, and an aversion to taking potentially unpopular decisions, according to Patterson and Perry.

Clinton is a very quick study—Perry remembered a time when Clinton was filming a commercial and took a typed page he had never seen before, glanced at it for less than a minute, and then recited it verbatim into the camera—and a highly energetic, tenacious worker, consumed by ambition. "He would call legislators late into the evening, lobbying for votes," said Patterson, "and we had to place the calls, waking up important state legislators well after midnight." One thing he wasn't was lazy. Clinton thrived on four hours of sleep a night, they said.

For all his intelligence and diligence, though, the troopers viewed Clinton as something of a klutz in matters of ordinary life. Patterson said he will never forget that he had to show Clinton how to operate a Mr. Coffee machine one Saturday morning—and then had to show him again on Sunday.

To be sure, Clinton rarely had to do anything for himself. During his twelve years as governor, Clinton had a full household staff, including several cooks and a babysitter on the premises paid for by the state, not to mention several inmates from Arkansas penitentiaries who worked gratis as gardeners and handymen on the grounds. (They were also made to provide free labor on the Little Rock home of the Rodhams, Hillary's parents.) The Clintons owned no property, and the state rented Bill the Lincoln town car in which he was driven.

In private moments with his bodyguards, often on long highway drives through the state, Clinton—with little experience of work outside the public sector—would sometimes reveal his insecurities. "He told me that if he was forced out of politics, he'd have no idea how to make a living," Perry said.

Clinton was perhaps more out of touch with the average



voter than President Bush. One day during the presidential campaign, the troopers witnessed a group of aides briefing the governor on the prices of various common groceries following media reports (later shown to be erroneous) that President Bush did not recognize a price-scanner at a supermarket in Florida. When Clinton was later asked by a viewer on "CBS This Morning" if he knew the price of bread and milk, and he answered correctly, campaign strategist James Carville cited this performance in a *New York Times* op-ed as an example of Clinton's ability "to empathize with average people."

Spending virtually every waking hour with him, the troopers were well positioned to judge both the private and the public man. They marveled at Clinton's ability to pass himself off as something he was not, viewing it as the key to his political success. Perry thought Clinton's facility with language allowed him to bridge the gap with the Arkansas voter. "He would always try to come across as old Joe the rag man, working beside you in Pine Bluff building shelves. He could give a great speech to the common people," said Perry. This false populism manifested itself in other ways, too, they said. Throughout his tenure, Clinton was careful to fly coach-class into and out of Little Rock; but during the rest of his itinerary, he insisted on flying first-class.

At other times, Clinton would enthusiastically talk shop, explaining to the troopers how he—a career politician who chuckled privately that he "never met a tax he didn't like," as Perry recalled it—managed to get elected and re-elected in Arkansas. Clinton told Perry that his strategy amounted to little more than old-fashioned interest-group politics: If he could hold the black vote, generally about 18 percent in a state election, his victory would be sealed. "He used to say that that meant his opponent had to get his 51 percent out of 82 percent," Perry said. "It was pretty smart politics."

His outsized ego notwithstanding, the troopers found Clinton to be personable and easy to be around. When his adolescent arrogance shone through, he was always quick to apologize to the troopers for his outbursts, which have included throwing an apple at the windshield of his car from the back seat, busting a cellular phone on cement pavement, and clearing the contents of an entire desk onto the floor.

"They were the kind of tantrums that you would not tolerate in a child," said Perry.

One of the worst explosions of temper that Larry Patterson remembered followed Clinton's ill-fated speech to the 1988 Democratic National Convention. Clinton spoke so long that delegates were shouting at him "Get off, get off" by the end. The speech had been written to last no more than seven minutes, but the Dukakis staff demanded the insertion of various lengthy passages. When Clinton arrived, the lights in the hall were supposed to be dramatically dimmed, as they had been for Ann Richards and Jesse Jackson. Instead, the lights glared, and monitors on either side of the podium mistakenly beamed "Jesse! Jesse!" causing the crowd to chant incongruously.

As Clinton left the podium, Patterson was standing on the platform along with various Democratic dignitaries. He saw Clinton stomp about, denouncing "that little Greek motherf---er" and promising to "get his ass, because he tried to kill me politically." A few weeks later, Dukakis called Clinton in Arkansas. Clinton put the telephone down for a moment and summoned Patterson in to hear what he was about to say. "He called him every kind of son of a bitch you can think of. Then he refused to endorse him until a few weeks before the election," Patterson recounted. Dukakis did not return a call seeking comment.

Dukakis was not the only Democratic competitor who met with Clinton's scorn. He seemed to delight in sharing his views on various politicians. The troopers said they remember Clinton commenting privately on Cuomo's alleged "Mafia connections" and joking about how Ted Kennedy "couldn't get a whore across a bridge." Perry said that after meeting with Jesse Jackson in October 1991 in Little Rock to get the reverend's blessing before announcing his presidential candidacy, Clinton told him that Jackson—who is reportedly contemplating a 1996 primary challenge to Clinton—was "a smart man, but I can't stand that motherf---er."

The troopers also saw first-hand that their fiercely competitive boss was not above a dirty trick or two. In the 1990 governor's race, Clinton asked Larry Patterson to locate a woman who was rumored to have had an illegitimate child by one of Clinton's primary opponents. "He was always having us research his opponents. If he had a source, he'd ask us to drop a dime on them and report back, even though he knew it was a violation of state law for us to take part in political campaigns," Patterson said. "On this one occasion, Clinton told me to go to the Holiday Inn at the [Little Rock] airport, find the woman, and offer her money or a job to sign a statement [about the illegitimate child]." Patterson followed Clinton's instructions to offer the illegal bribe, but the woman declined the offer and never came forward.

## V

The troopers were closer to Bill than to Hillary Clinton, who in their telling comes off as unflatteringly one-dimensional. The troopers chauffeured Clinton on a daily basis and were privy to his every move. Hillary, on the other hand, kept her distance. When she left the residence, she never informed them of her schedule. In fact, when she could, Hillary avoided even speaking to them, preferring to speak through Bill or some other third party, possibly because she disdained their role in facilitating his philandering.

Although Hillary's circle of friends and advisers included more activist liberals, the troopers saw Hillary—like Bill—as a shrewd and practical operator concerned primarily with personal political advancement. While the troopers saw Clinton playing the candidate, they saw Hillary playing the bad cop, gutsy and decisive, all backbone. They remembered well the now-famous time that Hillary showed up at a news conference of Tom McRae, Clinton's opponent in the 1990 governor's race, and interrupted the candidate's statement with a sustained defense of her husband.

From their direct observations, Patterson and Perry said they believe that Hillary is more obsessed than Bill with her political fortunes. She expressed this concern, as she did most everything, in language that makes the Watergate tapes sound like a Sunday school lesson. "I remember one time when Bill had been quoted in the morning paper saying something she didn't like," Patterson said. "I came into the mansion and he was standing at the top of the stairs and she was standing at the bottom screaming. She has a garbage mouth on her, and she was calling him motherf---er, c---sucker, and everything else. I went into the kitchen, and the cook, Miss Emma, turned to me and said, 'The devil's in that woman.'"

Hillary, as described by the troopers, pursued power with a single-minded intensity, had few friends outside politics, and was not especially close to her family—just like her husband. "Everything was politics. They wouldn't go out to dinner with friends the way you or I would or the way I've seen this governor [Tucker] do," said Perry. "If they were invited to a private party, and there were only going to be eight or ten people there, she would say, 'We're not going to waste time at that thing. There aren't enough people there.' I never saw Hillary just relax and have a good time."

While Bill genuinely enjoyed shaking every hand in a room, Hillary seemed to view retail politics as a distasteful if necessary evil. "She hated Arkansas. She would always say how 'backward' the state was," Perry said. One trooper told Perry that Hillary forbade him to speak when he accompanied her on a trip to Washington because, as she put it, he "sounded like a hick from Arkansas."

One of Hillary's pet projects in Arkansas was HIPPY, the Home Instruction Program for Preschool Youngsters, which provided the mothers of underprivileged pre-school youth with in-home instruction by state-sponsored tutors. During the presidential campaign, a commercial was filmed at the governor's mansion featuring dozens of the impoverished HIPPY children, who stood for several hours in the baking heat while the scene was set. For security purposes, the governor's residence is fitted out with several video cameras and one audio monitor—at the rear door—that connected it to the guard house. "They would usually forget that thing was on, and we would pick up a lot of what they said. On this particular day, I heard Hillary come out on the rear porch and say, 'I

want to get this s--- over with and get these damn people out of here,' " Perry remembered.

The troopers were also objects of Hillary's wrath. Patterson recalled the early morning of Labor Day in 1991, when Hillary came out of the mansion, got in her car, and drove off. Within a minute or so of leaving the gate, her aging blue Cutlass swung violently around and came charging back onto the grounds, tires squealing in the dust. "I thought something was terribly wrong, so I rushed out to her. And she screamed, 'Where is the goddamn f---ing flag?' It was early and we hadn't raised the flag yet. And she said, 'I want the goddamn f---ing flag up every f---ing morning at f---ing sunrise.' "

Such displays made Hillary by far the most unpopular member of the first family. Troopers volunteered to work several days of consecutive 16-hour shifts just to avoid traveling with her. Though it may have been a reflection of chauvinism on their part, the troopers thought Hillary "liked to intimidate men," Perry said. She would remark that troopers' guns are "phallic symbols." Or she would phone the mansion from her law office and order troopers to fetch feminine napkins from her bathroom and deliver them to her at the office.

Though they believe she advised her husband on all important matters of state, it seemed to the troopers that the Clintons led very separate lives otherwise. Hillary drove herself in the Cutlass each morning to the Rose Law Firm, about a mile from the mansion. Clinton worked either from his office in the capitol or in the residence. More often than not, one of the troopers drove the Clintons' daughter, Chelsea, to school. In the evenings, the family members generally dined separately.

When Bill and Hillary did spend time together, they were barely civil to one another. in the troopers' assessment. Many times the couple would be driven to an event an hour or more outside Little Rock—with Bill sitting in the front seat of the Lincoln with the driver and Hillary in the back seat—and say nothing at all to each other, which struck the troopers as quite tragic. "If he was dead politically, I would expect a divorce in 30 days," Roger Perry said.

## VI

Over the years, the troopers have seen Bill Clinton in compromising situations with dozens of women. They said their facilitation of the activities ranged from wiping make-up off his shirt collar, to standing "Hillary watch" while Clinton cavorted, to arranging sex sessions in hotel rooms and parking lots, to sneaking women into the governor's mansion while Hillary and Chelsea slept.

The troopers said Clinton devised and they executed an elaborate plan to accommodate his sexual appetites. Not all of the dozen or so troopers were assigned to these special duties. Perry and Patterson were two of a select handful, chosen by Clinton because he evidently trusted them to protect him and appreciated their street-smarts. It was kind of a down-home replay of the Kennedy days, as described by Richard Reeves:



> The logistics of Kennedy's liaisons with Judith Campbell and dozens of other women in the White House and in hotels, houses, and apartments around the country and around the world required secrecy and devotion rare even in the annals of the energetic service demanded by successful politicians. The arrangements were frequent. . . . The routine of clandestine comings and goings had to be taught to the willing among the women Kennedy regularly propositioned, often within a couple of minutes of introduction. Some of the action was somewhat graceful—or at least roses were sent with a card that said: "Friends of Evelyn Lincoln" [Lincoln was JFK's private secretary]. Some of it was in the back seats of cars. . . . The delivery duty was shared by old friends and by almost everyone in the White House from the military attachés and typists—some of whom had made the backstairs trip a few times themselves—to members of the Cabinet. . . . The women, secretaries, stars, the wives of friends, were symbols and rewards of aggressive privilege. Sneaking around, cleaning up the mess, covering up was all part of the game. . . . It was all good fun to those who knew—part of the thrill of being inside one of the president's closer circles. Keeping the secrets was part of the price of admission, and those who knew didn't tell those who didn't.

According to Clinton biographers Charles F. Allen and Jonathan Portis in *The Comeback Kid,* stories of Clinton's womanizing date back to the period when he was rejected by the voters in 1980 in his bid for a second term. "Clinton, seeing his political future vanish overnight, became careless about his actions," they wrote.

> He had achieved so much so fast. Now it was gone. Rumors began filtering into the newsrooms and throughout the state offices that Clinton was having an affair with another woman. Such rumors about politicians are commonplace, but this one

had a persistence about it. Because Clinton was no longer in the public light, the reporters and editors decided to ignore the talk.

As the troopers described the situation, the scale of Clinton's extramarital activities only increased after he won election to a second term in 1982. When Perry returned to security duty at the mansion in the late 1980s, other troopers regaled him with tales of Clinton's affairs in the 1982-to-1987 period. During the last five years of Clinton's governorship, while Patterson worked at the residence, he said he gained first-hand knowledge that Clinton was involved with a group of Little Rock women—regular mistresses or girlfriends—numbering about a half-dozen. The names of the mistresses with whom Patterson was familiar, some of whom are married and have children, are known to me, but will not be revealed here, so as not to exploit them more than Clinton already has, or to punish innocent family members. Each of the names given me by Patterson was corroborated by Perry—who has knowledge of them dating back to 1989—and the other two troopers with whom I met. I located each of the women by telephone, but each either denied involvement or would offer no comment.

Acording to Patterson, the long-term mistresses since 1987, in addition to Gennifer Flowers, included a staffer in Clinton's office; an Arkansas lawyer Clinton appointed to a judgeship; the wife of a prominent judge; a local newspaper reporter; an employee at Arkansas Power and Light, a state-regulated public utility; and a cosmetics sales clerk at a Little Rock department store. They ranged in age from their early 30s to their early 40s. According to both Patterson and Perry, throughout the period of their employment at the governor's residence, Clinton visited one of these women, either in the early morning or the late evening, or one of them came to the residence to see him, at least two or three times a week.

Clinton also had a series of brief affairs and one-time encounters from 1987 through early 1993 of which the troopers had direct knowledge. He often met women at social functions in Little Rock or on the road. Sometimes he would even use troopers as intermediaries, sending them off with messages and outright propositions to women to retire to back rooms, hotel rooms, or offices with him.

One of the troopers told the story of how Clinton had eyed a woman at a reception at the Excelsior Hotel in downtown Little Rock. According to the trooper, who told the story to both Patterson and Perry as well, Clinton asked him to approach the woman, whom the trooper remembered only as Paula, tell her how attractive the governor thought she was, and take her to a room in the hotel where Clinton would be waiting. As the troopers explained it, the standard procedure in a case like this was for one of them to inform the hotel that the governor needed a room for a short time because he was expecting an important call from the White House. (Not a terribly plausible story during the Reagan and Bush years, but it seemed to work like a charm with hotel clerks in Arkansas.) On this particular evening, after her encounter with Clinton,

which lasted no more than an hour as the trooper stood by in the hall, the trooper said Paula told him she was available to be Clinton's regular girlfriend if he so desired.

Patterson—tall and trim, with the upright demeanor and closely cropped hair of a military officer—recalled another example he witnessed late in the evening on the night after Clinton's disastrous speech to the 1988 Democratic convention. "Norman Lear gave us a suite of offices in a building next to the CNN building where the governor and his staff were working. Sandy Berger [a longtime Clinton adviser and now deputy national security adviser] had flown in to write the speech. The day after, Clinton spent the day 'spinning' the press. Well, that night, when we finished, we went back to the offices around midnight and a young lady of about 30 or 32, [name withheld], who the governor had just met at the convention, was there to meet us. He took her back in a private office, closed the door, and stayed in there for an hour or so while I waited to take him back to the Marriott where he and Hillary were staying."

According to the troopers, Clinton often visited his regular Little Rock girlfriends in the early morning during what were ostensibly long jogs. "He would jog out of the mansion grounds very early most mornings and then we would go pick up him at a McDonald's at 7th Street and Broadway," Patterson said. "When we picked him up, half the time he would be covered in sweat and the other half of the time there wouldn't be a drop of sweat on him, even in the middle of July in Little Rock. Sometimes I'd ask him, 'How far did you run today governor?' And he would say, 'Five miles.' I'd tell him there must be something wrong with his sweat glands because he didn't have a drop of sweat on him. He'd say, 'I can't fool you guys, can I?'"

As the troopers recounted events, several times a month in the late evening, Clinton would leave the residence in a state car borrowed from one of the troopers, because the governor's Lincoln was easily recognizable on the streets of Little Rock. "We were told to keep our cars clean for this purpose," said Perry, who often lent Clinton his green Corsica. A few minutes after the lights clicked off in the first couple's bedroom, Clinton would get out of bed and "go out for a drive," leaving instructions at the guard house that if Hillary woke up, he was to be alerted on his cellular phone. On more than a dozen occasions since 1987, Patterson said he saw one of the troopers' cars parked outside one particular girlfriend's condominium as he drove home after being relieved from his shift at the mansion at midnight. The woman lived just a few doors from Patterson on Shadow Oaks in Sherwood, on the outskirts of Little Rock.

The troopers also drove Clinton from the capitol late in the evening to various women's homes and waited for hours for him to emerge. They became expert at parking unobtrusively, by backing into driveways and the like. Patterson recalled that the first time he parked in this manner outside the home of the Clinton staffer in 1987, where he sat from midnight until about 4:30 a.m. waiting on the governor, Clinton congratulated him on his stealthiness. "He told me it was our responsibility to cover his ass so he wouldn't get in trouble," Patterson said.

By all accounts, whenever Clinton returned to the resi-

dence after one of these encounters, he went to the bathroom in the troopers' guard house, where he washed up before entering the main house.

During the day, when Hillary was in town but not at home and Clinton wanted privacy in the residence with a woman, the troopers said, they were instructed to buzz him on the intercom as soon as Hillary's car approached the front gate of the compound. When Hillary was out of town, the troopers remembered innumerable occasions when Bill wouldn't hesitate to seize the opportunity to entertain women at all hours of the day and night, clearing them through the gates for what the troopers said he called a "personal tour of the mansion."

After the presidential election, Bill instructed the troopers to clear women through the outer Secret Service blockade on the street by falsely identifying them as staff, or as cousins of the troopers. Shortly before the Clintons left Little Rock for Washington, Roger Perry said, one of the troopers (whom I also interviewed) told him that he had arranged for the AP&L employee to arrive at the governor's mansion at 5:15 a.m., dressed in a trench coat and a baseball cap at Clinton's instruction. The trooper told Perry he had told the Secret Service that she was "staff coming in very early." Clinton had arranged for the trooper to bring the woman through a basement door, which opened into a game room, where Clinton was waiting. The trooper said he was instructed to stand at the top of the stairs leading from the basement to the main floor of the residence and to alert Clinton if Hillary woke up, according to Perry.

Over time, as both Patterson and Perry described it, each mistress was assigned a particular trooper whose job it was to call her and find out when she could see Bill at her home, drive her to various events where Bill was appearing, and deliver gifts to her. "Three times after the [presidential] election I called [the judge's wife] to see if she was at home for the governor," Patterson said. They also said Clinton regularly slipped them cash to pay for gifts for the women they were told to pick up from Victoria's Secret in the Little Rock mall and other women's shops around town. "He told us to make sure they were kept in the trunk of the cars and never bring them into the house where Hillary might see them," Perry said. At Christmas 1992, the trooper whose request for autographed photos for his family Clinton had waved away was able to get his autographs only by insisting on a signature each time Clinton asked him to pick up and deliver a gift to a woman.

In everyone's estimation, Clinton built relationships with each of the long-time girlfriends and treated them well, though perhaps manipulating them to his own ends. He once told Roger Perry he was in love with one of them, though there is debate among the troopers as to which of the women he meant.

When speaking to the troopers about these liaisons, Clinton was usually quite circumspect, but on some occasions he inexplicably permitted himself to be caught *in flagrante delicto.* More than once, Larry Patterson said, he stood guard and witnessed the department store clerk performing oral sex on Bill in a parked car, including in the parking lot of Chelsea's elementary school, and on the grounds of the governor's mansion.

In one instance, in the fall of 1988 or 1989, as Patterson remembered it, he was driving Clinton to an annual reception for the Harrison County Chamber of Commerce in a hospitality suite at the Camelot Hotel in Little Rock. On the way, Clinton suggested a detour to Chelsea's school, Booker Elementary. When they arrived, Clinton told Patterson the sales clerk was sitting in her car, which was parked in the otherwise deserted front parking lot. "I parked across from the entrance and stood outside the car looking around, about 120 feet from where they were parked in a lot that was pretty well lit. I could see Clinton get into the front seat and then the lady's head go into his lap. They stayed in the car for 30 or 40 minutes," Patterson said.



In a second instance, Patterson was on duty at the residence, again late in the evening, when the same woman drove up in a yellow and black Datsun or Nissan pick-up truck and asked to see Clinton. "The governor came out of the residence and climbed into the front seat of the truck, which she parked in an area off the rear drive," Patterson recalled. This time, Patterson said, with a gleam in his eye, he got an even clearer view of the sex act by aiming a remote-controlled camera with a swivel base mounted on a 30-foot pole in the back yard of the house right into the truck. The image was projected onto a 27-inch video screen in the guard house. "He was sitting on the passenger side and she was behind the wheel. I pointed the thing directly into the windshield, and watched on the screen as the governor [received oral sex]," Patterson said.

As this act was occurring, Chelsea's babysitter at the time, Melissa Jolley, drove into the compound. Realizing that she would usually drive right by the area where the

pick-up was parked on her way to the guest house where she lived, Patterson quickly intercepted her, told her there was a security problem on the grounds, and then instructed her to drive by a different route, go in her house, and stay there. "When they were done Clinton came running over to me and asked, 'Did she see us? Did she see us?' I told him what I'd done and he said 'Atta boy,'" Patterson said.

On yet another occasion that Patterson described, the governor and his security detail arrived at the Little Rock airport and Clinton told his bodyguards that he was going to be driven back to the residence by the Arkansas lawyer, who had met the plane, so that she could show him her new Jaguar. "On the ride back he drove and she was nowhere to be seen in the car," Patterson said. "Later he told me that he had researched the subject in the Bible and oral sex isn't considered adultery."

Like many men, Clinton and the troopers shared locker room comments about women and sex. "When he was in a down mood, all you had to do was start talking about sex and he would come alive," said Perry. "I remember one time when I asked him to sign an autograph for a female friend, and he asked me, 'Does she have big titties?'"

"He told me there are two kinds of f---ing redheads," Patterson said. "Beautiful f---ing redheads and ugly f---ing redheads." About a local reporter (not the one with whom he was involved), Clinton told Patterson, "I bet she could give [good oral sex]." Complaining about the same woman, Clinton later said, "If you were a buddy you would f--- her and get her off my ass."

## VII

Hillary apparently was aware of Bill's hanky-panky, at least in general terms. Patterson recalled one Sunday afternoon in the late 1980s when he heard Hillary complain to Bill in highly colorful language about their inadequate sex life. Listening to the audio monitor at the rear porch of the main house, Patterson said he sat in the guard house and heard Hillary tell Bill, during an argument in the kitchen, "I need to be f---ed more than twice a year." When Clinton spent an inordinate amount of time speaking with an attractive woman at a public event—apparently a common occurrence—several troopers said they have heard Hillary complain bitterly. "She would say, 'Come on Bill, put your dick up. You can't f--- her here,'" as Patterson remembered the unforgettable phrasing.

"Even though she knew what was going on, he would hide it because he didn't want the confrontation," Perry said. Bill did get caught every once in a while. Generally a heavy sleeper, Hillary once woke up in the middle of the night, flicked on the bedroom light, and called down to the guard house looking for Bill. "The sorry damn son of a bitch!" she exclaimed when told the governor had gone out for a drive. Perry grabbed the cellular phone, turning Clinton up at one of the women's homes, and told him to get back to the residence fast. "He started saying 'Oh god, god, god. What did you tell her?'" Perry recalled. When Clinton arrived soon after, Hillary was waiting in the kitchen, where, not unexpectedly,

a wild screaming match ensued. When Perry entered the kitchen after the dust had settled, the room was a wreck, with a cabinet door kicked off its hinges.

Another fight ensued on the Clintons' final day in Little Rock, according to Patterson. Clinton asked him to bring one of his women friends to the send-off ceremony at the Little Rock airport before he departed for Washington. "When I got there with [the judge's wife], Hillary turned to me and said, 'What the f--- do you think you're doing? I know who that whore is. I know what she's doing here. Get her out of here.' Clinton was standing right there. I looked at him and he just shrugged his shoulders, so I took her out of there and dropped her at the Holiday Inn Center City."

The troopers speculated that Hillary tolerated this behavior much as eighteenth-century aristocrats maintained marriages of convenience to suit the social and material needs of both parties. Hillary herself was intimately involved with the late Vincent Foster, a partner at the Rose Law Firm and later deputy White House counsel. Foster killed himself in July under circumstances that remain murky. "It was common knowledge around the mansion that Hillary and Vince were having an affair," said Larry Patterson, though he conceded that the evidence for this is more circumstantial than his first-hand knowledge of Clinton's behavior.

According to all of the troopers, whenever Clinton left town, no sooner would he be out of the mansion gates than Foster would appear, often staying in the residence with Hillary into the wee hours of the morning. One of the off-the-record troopers drove Hillary and Foster to a mountain cabin in Heber Springs, maintained by the Rose firm as an out-of-town retreat for its lawyers, where the two spent significant amounts of time alone. Patterson and Perry were both aware of this at the time. On several chance occasions—at the Heber Springs retreat, and once stopped at a traffic light in Little Rock—troopers said they observed Foster and Hillary embracing and open-mouth kissing.

Patterson once saw the two in a compromising position at a birthday party for Hillary held at the Little Rock French restaurant Alouette's. Bill also attended. While seated at the restaurant's bar, outside the dining room, Patterson said he observed Hillary and another woman from the Rose firm, Carolyn Huber, come out to the bar for a private chat. Soon thereafter, Foster emerged from the dining room on his way to the men's room. "He came up behind Hillary, and squeezed her rear end with both of his hands. Then he winked and gave me the 'OK' sign," Patterson said. "On the way back, Huber was turned away, and Vince put his hand over one of Hillary's breasts and made the same 'OK' sign to me. And she just stood there cooing, 'Oh Vince. Oh Vince.'" Huber, now an assistant to the president, said she never attended such a party.

## VIII

The only person Bill Clinton has specifically denied having an affair with is Gennifer Flowers, yet all of the troopers agreed that Clinton and Flowers were roman-

tically involved for several years.[5] They said Flowers called the mansion regularly, asking to speak with "Bill." As the troopers described the routine, when Hillary was not at home, Clinton generally took the calls. When she was, Clinton always instructed a trooper to tell Flowers that he would call her back. Soon thereafter, Clinton would trundle down to the troopers' guard house and retreat to a private back room, where he would then get on the telephone—a line that Hillary could not pick up from inside the mansion. This is how he regularly handled personal calls from women.

Patterson said he often drove Clinton to the Quapaw Towers in Little Rock, where Flowers lived, late in the evening, waiting in the parking lot for as long as two hours for Clinton's return. "Every place we ever went, even a private party, we would go in with him, except a woman's house," Patterson said. Perhaps because his relationship with Flowers began long before he began to acknowledge his behavior to the troopers, Clinton had a story to cover his tracks. Clinton told Patterson that he was visiting Maurice Smith, director of the state highway department, who lived in the same building, but Patterson believes that if this were true he would have gone into the building with Clinton, as was usual with business meetings.[6]

Yet despite this cover story, Clinton evidently couldn't resist bragging about his sexual exploits. On one occasion, Perry recalled, Clinton said that Gennifer Flowers "could suck a tennis ball through a garden hose."

According to Patterson and Perry, in the late spring of 1991, as Clinton was seriously considering making a presidential run, Flowers began calling him incessantly, sometimes four or five times a week. Shortly after this spate of calls, Flowers got a job as an administrative assistant for the Arkansas Board of Review's appeal tribunal, which hears unemployment cases. According to published news accounts, Flowers first asked Clinton about obtaining a state job in September 1990, and Clinton turned the request over to his special assistant Judy Gaddy. After applying for one position and being turned down, Flowers complained in a letter to Clinton the following January

[5] It could be argued that Clinton did not categorically deny any romantic involvement with Flowers. For example, in the Kroft interview, Clinton was asked about Flowers's allegation of a "12-year affair" and Clinton answered, "That allegation is false." This could leave open the possibility that the affair lasted less than twelve years.

[6] According to Flowers in a *Penthouse* interview in December 1992, Clinton often jogged over to her apartment from the nearby governor's mansion, "arriving sweaty but eager." On other occasions, Flowers said, Clinton's driver sat in the car in the complex driveway and waited for two hours or so. In an interview with me, Flowers said she knew Larry Patterson and also knew that Clinton's drivers waited for him in the parking lot. During the initial visits, Clinton entered the building through the lobby and was seen getting off the elevator at the second floor, where Flowers lived. Rumors soon circulated through the building. Thereafter, Flowers said, she waited on her balcony until she saw the governor's Lincoln pull in and then went to the first floor to prop open a fire exit door with a newspaper so Clinton could enter the building undetected.

and mentioned allegations linking the two romantically. Shortly thereafter, Judy Gaddy inquired about a job opening at the Board of Review for Flowers. Flowers applied. Bill Gaddy, Judy's husband and another Clinton appointee, is the director of the state's Employment Security Division, which oversees the review board. According to a state committee which later investigated the matter, with Gaddy's approval, Don K. Barnes, the chairman of the review board who hired Flowers, improperly waived certain hiring procedures, and Flowers got the job. Barnes later said that Gaddy had recommended Flowers for the job, but Gaddy has denied this. Flowers told the *Star* that Clinton "pulled strings" to secure the job for her, which Clinton has denied. Patterson, however, corroborated Flowers's allegation. "I remember I was driving the car when Clinton got on the phone and discussed that particular job with Bill Gaddy. There is no doubt in my mind that he was asking Gaddy to give it to Gennifer," Patterson said. Gaddy denied ever having a telephone conversation with Clinton about Flowers. (Flowers lost the job for failing to show up for work three days in a row, shortly after coming forward with her story in the *Star*. She is currently circulating a book proposal in New York.)

Even before the Flowers story broke, Clinton was aware that the issue of his womanizing would plague him in a presidential campaign. "He was walking along one day in 1991 with Bruce Lindsey [now a senior White House aide] and he said, 'If I make the race, I'm going to keep Larry around to deal with all the women,' " Patterson said. ("That never happened," Lindsey said.) According to Perry, Clinton told him in 1990 that he was considering not running for re-election in Arkansas because he feared his history of womanizing would be exposed. As it happened, during that year's campaign, a disgruntled former state employee named Larry Nichols filed a lawsuit linking Clinton to five named women and making the unsubstantiated charge that he had been fired as part of an attempted cover-up involving a secret fund used to facilitate Clinton's trysts. The suit was reported in Arkansas, but neither the precise nature of the allegations nor the women's names were mentioned.

In 1992, the task of "dealing with the women" was ultimately assigned to Buddy Young, the supervisory trooper in governor's security, the troopers said. "Buddy Young specifically told me that he was trying to keep a lid on the other women," Patterson said. "If one more came out, they knew Gennifer would be credible. He said they could weather the storm on one, but not two. He told me he went to Texas to talk to Elizabeth Ward [a former Miss America named in the Nichols suit]. He said that she had told him that she didn't need any money, but he said, 'If the money's right, I know she'll keep her mouth shut.' "[7] Young denied this. "I've never spoken to Elizabeth Ward," he said. Ward could not be reached for comment.

According to Perry, about six weeks before the *Star* inter-

[7] When Ward appeared in the May 1992 issue of *Playboy*, which did not mention the alleged affair, the Clinton campaign quickly circulated a written statement from Ward in which she denied any romantic involvement with Clinton.

view was published, Flowers again began calling the residence day and night asking to speak with Bill. Word around the guard house was that Flowers might be trying to blackmail Clinton by threatening to expose their affair. "She was constantly calling, sometimes several times a day. And we were aware that she was up to something. We were told that she might be trying to tape the calls with Clinton, so I called her Gennifer Fowler so it would look like I didn't know who she was." Here is an excerpt from a transcript of the Flowers tapes:

> PERRY: Governor's mansion, Roger Perry.
> FLOWERS: Is Bill Clinton in please?
> PERRY: Ma'am, he's with some people right now. May I ask who's calling?
> FLOWERS: This is Gennifer Flowers, I'm returning his call.
> PERRY: Gennifer Fowler?
> FLOWERS: Flowers.
> PERRY: OK. Hang on just a second. . . .

After the story broke, the damage-controllers went into high gear. Pursuing the story further, reporters began filing requests for various state records, including personnel files and phone records. Up to the time the *Star* story appeared, the troopers said they kept two logs at the guard house. One was a gate log, produced on a typewriter, noting all vehicles coming into or out of the mansion gates. A second record was a standard telephone message log, with one copy of any telephone message going to Bill or Hillary and one copy retained in the log book.

Patterson said he was told by Buddy Young that Hillary Clinton ordered that the gate log no longer be maintained. And a new procedure was instituted for handling the phone log. Previously, old log books were stored in a maintenance house on the property after they were filled. Post-Flowers, the troopers said, they were told to bring the message log book directly to Buddy Young, who disposed of it. It was Patterson's understanding that the old logs from the maintenance house—records kept by state employees—were destroyed on Hillary's orders.

In another instance in the spring of 1992, aides to Clinton pored over telephone records for evidence of personal calls to women, Patterson said. "I was told by Buddy Young that there were several calls made by the governor on his cellular phone to a number in Sherwood, Arkansas, that belonged to [the Clinton girlfriend who lived near Patterson]. At the time, the media was covering the Flowers story. I was told that if the records were made public Betsey Wright had told Buddy that I was going to have to take responsibility for making the calls to protect the governor and he asked me to write a check to pay for them." In what Patterson believes was seen as an act of disloyalty by the Clinton clique, he refused to do so.

Young flatly denied this story. Wright, now a Washington lobbyist, said Patterson's account was "absurd." When she was the governor's chief of staff, Wright did regularly review all telephone records and ask people to pay for their personal calls, she said. "But I would never have asked someone to pay for calls that were not their own. Poor Larry has all of that screwed up." When I asked Wright if she knew this particular Sherwood woman, she said, "It is not an unfamiliar

name, but one of the wonderful things about a place like Little Rock is that you get to know everyone."

Throughout the tense period, Young constantly warned the troopers, "If you're smart, you won't talk to the press," the same warning they said he delivered a year later as they prepared to go public with this story.

Clinton, meanwhile, was by turns angry and very worried. From the back of his Lincoln he would say, "What does that whore think she's doing to me?" He also referred to Flowers as a "f---ing slut," according to Patterson. On the Flowers tapes, after telling Flowers "if they ever hit you with it just say 'no' and go on," Clinton had said he would be free and clear on the womanizing issue so long as "they don't have pictures." In a conversation in the kitchen of the governor's mansion after Flowers went public, Clinton asked one of the troopers for advice on how to handle the situation. Clinton said that without photos, nothing could be proved. "I told him, 'Then lie your ass off,'" the trooper said, and Clinton apparently did. □

© 1993 The American Spectator. All Rights Reserved.

## REPRINTS AVAILABLE

Copies of David Brock's "Living With the Clintons" are available for $5 each; ten for $35; twenty-five for $75; one-hundred for $250.

Send your order to:
***The American Spectator***,
P.O. Box 549, Arlington, Virginia 22216-0549

See page 37 for a complete listing of reprints available.

Subscribe to
# THE AMERICAN
# SPECTATOR ®
today!

12 big monthly issues for only $35.

## Call **1-800-524-3469**

or send this handy coupon

- - - - - - - - - - - - - - - - - - -

***The American Spectator,***
Subscription Department,
P.O. Box 657, Mt. Morris, IL 61054-0657.

☐ **Yes**, please send me 12 monthly issues of *The American Spectator* for only $35.00.

☐ Payment enclosed          ☐ Bill me later

Name: _____

Address: _____

City: _____ State: _____

Zip code: _____

B94DB1