FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 0 1 1998

JAMES W. McCORMACK, CLERK
By: _____
                                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

PAULA CORBIN JONES,                        *
                                           *
            Plaintiff,                     *
                                           *
                                           *
vs.                                        *   No. LR-C-94-290
                                           *
                                           *
                                           *
                                           *
WILLIAM JEFFERSON CLINTON                   *
and DANNY FERGUSON,                         *
                                           *
            Defendants.                    *

MEMORANDUM OPINION AND ORDER

        The plaintiff in this lawsuit, Paula Corbin Jones, seeks civil damages from William

Jefferson Clinton, President of the United States, and Danny Ferguson, a former Arkansas

State Police Officer, for alleged actions beginning with an incident in a hotel suite in Little

Rock, Arkansas.  This case was previously before the Supreme Court of the United States to

resolve the issue of Presidential immunity but was remanded to this Court following the

Supreme Court's determination that there is no constitutional impediment to allowing

plaintiff's case to proceed while the President is in office.  *See Clinton v. Jones*, 117 S.Ct.

1636 (1997).  Following remand, the President filed a motion for judgment on the pleadings

and dismissal of the complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Ferguson joined in the President's motion.  By Memorandum Opinion and Order dated August

22, 1997, this Court granted in part and denied in part the President's motion.  *See Jones v.*

76

*Clinton*, 974 F.Supp. 712 (E.D.Ark. 1997).  The Court dismissed plaintiff's defamation claim

against the President, dismissed her due process claim for deprivation of a property interest in

her State employment, and dismissed her due process claims for deprivation of a liberty

interest based on false imprisonment and injury to reputation, but concluded that the remaining

claims in plaintiff's complaint stated viable causes of action.  *See id.*  Plaintiff subsequently

obtained new counsel and filed a motion for leave to file a first amended complaint, which the

Court granted, albeit with several qualifications.  *See* Order of November 24, 1997.[1]  The

matter is now before the Court on motion of both the President and Ferguson for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff has responded

in opposition to these motions, and the President and Ferguson have each filed a reply to

plaintiff's response to their motions.  For the reasons that follow, the Court finds that the

President's and Ferguson's motions for summary judgment should both be and hereby are

granted.[2]

I.

This lawsuit is based on an incident that is said to have taken place on the afternoon of

May 8, 1991, in a suite at the Excelsior Hotel in Little Rock, Arkansas.  President Clinton was

---

[1] Among other things, the Court allowed plaintiff to drop her remaining defamation claim against Ferguson and allowed her to drop her remaining loss-of-reputation claims.  The Court also allowed plaintiff to clarify her constitutional and civil rights claims and conform them more fully to the facts previously pled, but only to the extent that plaintiff was not thereby asserting new causes of action or attempting to add Ferguson as a defendant on any cause of action where he was not previously considered a defendant.

[2] All other pending motions in this case, including the motion filed on Saturday, March 28, 1998, in Pine Bluff, Arkansas, have no bearing on the issues raised by the President's and Ferguson's motions for summary judgment and are therefore not addressed.

Governor of the State of Arkansas at the time, and plaintiff was a State employee with the

Arkansas Industrial Development Commission ("AIDC"), having begun her State employment

on March 11, 1991. Ferguson was an Arkansas State Police officer assigned to the Governor's

security detail.

According to the record, then-Governor Clinton was at the Excelsior Hotel on the day

in question delivering a speech at an official conference being sponsored by the AIDC. Am.

Compl. ¶ 7.[3] Plaintiff states that she and another AIDC employee, Pamela Blackard, were

working at a registration desk for the AIDC when a man approached the desk and informed

her and Blackard that he was Trooper Danny Ferguson, the Governor's bodyguard. Pl.'s

Statement of Mat. Facts, ¶¶ 1-2. She states that Ferguson made small talk with her and

Blackard and that they asked him if he had a gun as he was in street clothes and they "wanted

to know." Pl.'s Depo. at 101. Ferguson acknowledged that he did and, after being asked to

show the gun to them, left the registration desk to return to the Governor. *Id.*; Pl.'s Statement

of Mat. Facts, ¶ 2. The conversation between plaintiff, Blackard, and Ferguson lasted

approximately five minutes and consisted of light, friendly banter; there was nothing

intimidating, threatening, or coercive about it. Pl.'s Depo. at 226-27.

Upon leaving the registration desk, Ferguson apparently had a conversation with the

Governor about the possibility of meeting with plaintiff, during which Ferguson states the

---

[3] In addressing the issues in this case, the Court has viewed the record in the light most favorable to plaintiff and given her the benefit of all reasonable factual inferences, which is required at this stage of the proceedings. *See Christopher v. Adam's Mark Hotel*, — F.3d —, 1998 WL 92202, *1 (8th Cir. March 5, 1998). The Court has, however, deemed admitted those facts set forth by the President in his statement of material facts that plaintiff has not specifically controverted in her statement of material facts. See Rule 56.1(c) of the Rules of the United States District Court for the Eastern and Western Districts of Arkansas, which provides that "[a]ll material facts set forth in the statement filed by the moving party ... shall be deemed admitted unless controverted by the statement filed by the non-moving party...."

Governor remarked that plaintiff had "that come-hither look," *i.e.* "a sort of [sexually] suggestive appearance from the look or dress." Ferguson Depo. at 50; Pl.'s Statement of Mat. Facts, ¶ 3; President's Depo. at 109.[4] He states that "some time later" the Governor asked him to "get him a room, that he was expecting a call from the White House and ... had several phone calls that he needed to make," and asked him to go to the car and get his briefcase containing the phone messages. Ferguson Depo. at 50, 67. Ferguson states that upon obtaining the room, the Governor told him that if plaintiff wanted to meet him, she could "come up." *Id.* at 50.

Plaintiff states that Ferguson later reappeared at the registration desk, delivered a piece of paper to her with a four-digit number written on it, and said that the Governor would like to meet with her in this suite number. Pl.'s Statement of Mat. Facts, ¶ 6. She states that she, Blackard, and Ferguson talked about what the Governor could want and that Ferguson stated, among other things, "We do this all the time." *Id.* Thinking that it was an honor to be asked to meet the Governor and that it might lead to an enhanced employment opportunity, plaintiff states that she agreed to the meeting and that Ferguson escorted her to the floor of the hotel upon which the Governor's suite was located. Am. Compl. ¶¶ 11-13.

Plaintiff states that upon arriving at the suite and announcing herself, the Governor shook her hand, invited her in, and closed the door. Pl.'s Statement of Mat. Facts, ¶¶ 7-8. She states that a few minutes of small talk ensued, which included the Governor asking her about her job and him mentioning that Dave Harrington, plaintiff's ultimate superior within

---

[4] Ferguson states that plaintiff informed him that she would like to meet the Governor, remarking that she thought the Governor "was good-looking [and] had sexy hair," Ferguson Depo. at 50, while plaintiff states that Ferguson asked her if she would like to meet the Governor and that she was "excited" about the possibility, Pl.'s Depo. at 101.

4

the AIDC and a Clinton appointee, was his "good friend." *Id.* ¶ 8; Am. Compl. ¶ 17.

Plaintiff states that the Governor then "unexpectedly reached over to [her], took her hand, and

pulled her toward him, so that their bodies were close to each other." Pl.'s Statement of Mat.

Facts, ¶ 9. She states she removed her hand from his and retreated several feet, but that the

Governor approached her again and, while saying, "I love the way your hair flows down your

back" and "I love your curves," put his hand on her leg, started sliding it toward her pelvic

area, and bent down to attempt to kiss her on the neck, all without her consent. *Id.* ¶¶ 9-10;

Pl.'s Depo. at 237-38.[5]  Plaintiff states that she exclaimed, "What are you doing?," told the

Governor that she was "not that kind of girl," and "escaped" from the Governor's reach "by

walking away from him." Pl.'s Statement of Mat. Facts, ¶ 11; Pl.'s Depo. at 237.  She states

she was extremely upset and confused and, not knowing what to do, attempted to distract the

Governor by chatting about his wife. Pl.'s Statement of Mat. Facts, ¶ 11.  Plaintiff states that

she sat down at the end of the sofa nearest the door, but that the Governor approached the sofa

where she had taken a seat and, as he sat down, "lowered his trousers and underwear, exposed

his penis (which was erect) and told [her] to 'kiss it.'" *Id.*[6]  She states that she was "horrified"

by this and that she "jumped up from the couch" and told the Governor that she had to go,

saying something to the effect that she had to get back to the registration desk. *Id.* ¶ 12.

Plaintiff states that the Governor, "while fondling his penis," said, "Well, I don't want to

---

[5] In her amended complaint, plaintiff states that the Governor "put his hand on [her] leg and started sliding it toward the hem of [her] culottes, apparently attempting to reach [her] pelvic area." Am. Compl. ¶ 20. In her original complaint, plaintiff states that the Governor "put his hand on [her] leg and started sliding it toward the hem of [her] culottes," with no reference to her "pelvic area." Compl. ¶ 20.

[6] Plaintiff states in her amended complaint that the Governor "asked" her to "kiss it" rather than telling her to do so. Am. Compl. ¶ 21. She states in her deposition that the Governor's specific words to her were, "Would you kiss it for me?" Pl.'s Depo. at 108.

make you do anything you don't want to do," and then pulled up his pants and said, "If you get in trouble for leaving work, have Dave call me immediately and I'll take care of it." *Id.* She states that as she left the room (the door of which was not locked), the Governor "detained" her momentarily, "looked sternly" at her, and said, "You are smart. Let's keep this between ourselves." *Id.*; Pl.'s Depo. at 94, 96-97.[7]

Plaintiff states that the Governor's advances to her were unwelcome, that she never said or did anything to suggest to the Governor that she was willing to have sex with him, and that during the time they were together in the hotel suite, she resisted his advances although she was "stunned by them and intimidated by who he was." Pl.'s Statement of Mat. Facts, ¶ 14. She states that when the Governor referred to Dave Harrington, she "understood that he was telling her that he had control over Mr. Harrington and over her job, and that he was willing to use that power." *Id.* ¶ 13. She states that from that point on, she was "very fearful" that her refusal to submit to the Governor's advances could damage her career and even jeopardize her employment. *Id.*

Plaintiff states that when she left the hotel suite, she was in shock and upset but tried to maintain her composure. *Id.* ¶ 15. She states she saw Ferguson waiting outside the suite but that he did not escort her back to the registration desk and nothing was said between them. *Id.* Ferguson states that five or ten minutes after plaintiff exited the suite he joined the Governor for their return to the Governor's Mansion and that the Governor, who was working on some papers that he had spread out on the desk, said, "She came up here, and nothing happened."

---

[7] Plaintiff's allegation that the Governor momentarily "detained" her was not included in either her original or amended complaint.

6

*Id.* ¶ 16; Ferguson Depo. at 63.

Plaintiff states she returned to the registration desk and told Blackard some of what had happened. Blackard Depo. at 68. Blackard states that plaintiff was shaking and embarrassed. *Id.* Following the Conference, plaintiff states she went to the workplace of a friend, Debra Ballentine, and told her of the incident as well. Pl.'s Statement of Mat. Facts, ¶ 18. Ballentine states that plaintiff was upset and crying. Ballentine Depo. at 48. Later that same day, plaintiff states she told her sister, Charlotte Corbin Brown, what had happened and, within the next two days, also told her other sister, Lydia Corbin Cathey, of the incident. *Id.* ¶ 20. Brown's observations of plaintiff's demeanor apparently are not included in the record. Cathey, however, states that plaintiff was "bawling" and "squalling," and that she appeared scared, embarrassed, and ashamed. Cathey Depo. at 52.

Ballentine states that she encouraged plaintiff to report the incident to her boss or to the police, but that plaintiff declined, pointing out that her boss was friends with the Governor and that the police were the ones who took her to the hotel suite. Ballentine Depo. at 50. Ballentine further states that plaintiff stated she did not want her fiancé to know of the incident and that she "just want[ed] this thing to go away." *Id.* Plaintiff states that what the Governor and Ferguson had said and done made her "afraid" to file charges. Pl.'s Statement of Mat. Facts, ¶ 19.

Plaintiff continued to work at AIDC following the alleged incident in the hotel suite. *Id.* ¶ 22. One of her duties was to deliver documents to and from the Office of the Governor, as well as other offices around the Arkansas State Capitol. *Id.* She states that in June 1991, while performing these duties for the AIDC, she encountered Ferguson who told her that Mrs.

Clinton was out of town often and that the Governor wanted her phone number and wanted to see her. *Id.* Plaintiff states she refused to provide her phone number to Ferguson. *Id.* She states that Ferguson also asked her how her fiancé, Steve, was doing, even though she had never told Ferguson or the Governor his name, and that this "frightened" her. *Id.* ¶ 23. Plaintiff states that she again encountered Ferguson following her return to work from maternity leave and that he said he had "told Bill how good looking you are since you've had the baby." *Id.* ¶ 25. She also states that she was "accosted" by the Governor in the Rotunda of the Arkansas State Capitol when he "draped his arm over her, pulled her close to him and held her tightly to his body," and said to his bodyguard, "Don't we make a beautiful couple: Beauty and the Beast?" *Id.* ¶ 24. Plaintiff additionally states that on an unspecified date, she was waiting in the Governor's outer office on a delivery run when the Governor entered the office, patted her on the shoulder, and in a "friendly fashion" said, "How are you doing, Paula?" Pl.'s Depo. at 244-45.

Plaintiff states that she continued to work at AIDC "even though she was in constant fear that [the Governor] would retaliate against her because she had refused to have sex with him." *Id.* ¶ 27. She states this fear prevented her from enjoying her job. *Id.* Plaintiff states that she was treated "very rudely" by certain superiors in AIDC, including her direct supervisor, Clydine Pennington, and that this "rude treatment" had not happened prior to her encounter with the Governor. *Id.* She states that after her maternity leave, she was transferred to a position which had much less responsibility and that much of the time she had nothing to do. *Id.* ¶ 28; Pl.'s Depo. at 53. Plaintiff states that she was not learning anything, that her work could not be fairly evaluated, and that as a result, she could not be fairly

8

considered for advancement and other opportunities. Pl.'s Statement of Mat. Facts, ¶ 28.  She

states that Pennington told her the reason for the transfer was that her prior position had been

eliminated, but that she later learned this was untrue, as her former position was being

occupied by another employee. *Id.*  Plaintiff states that she repeatedly expressed to

Pennington an interest in transferring to particular positions at a higher "grade" which involved

more challenging duties, more potential for advancement, and more compensation, but that

Pennington always discouraged her from doing so and told her she should not bother to apply

for those positions. *Id.* ¶ 29.  She goes on to state that her superiors exhibited hostility toward

her by moving her work location, refusing to give her meaningful work, watching her

constantly, and failing to give her flowers on Secretary's Day in 1992, even though all the

other women in the office received flowers. *Id.* ¶ 30.

Plaintiff voluntarily terminated her employment with AIDC on February 20, 1993, in

order to move to California with her husband, who had been transferred. Am. Compl. ¶ 40;

Pl.'s Depo. at 48.  She states that in January 1994, while visiting family and friends in

Arkansas, she was informed of an article in *The American Spectator* magazine that she claims

referred to her alleged encounter with the Governor at the Excelsior Hotel and incorrectly

suggested that she had engaged in sexual relations with the Governor. Pl.'s Statement of Mat.

Facts, ¶ 33.  Plaintiff states that she also encountered Ferguson in a restaurant during this

same time and that he indicated he was the source for the article and that he knew she had

refused the Governor's alleged advances because, he said, "Clinton told me you wouldn't do

anything anyway, Paula." *Id.* ¶ 35.

On February 11, 1994, at an event attended by the media, plaintiff states that she

publicly asked President Clinton to acknowledge the incident mentioned in the article in *The American Spectator,* to state that she had rejected his advances, and to apologize to her, but that the President responded to her request for an apology by having his press spokespersons deliver a statement on his behalf that the incident never happened and that he never met plaintiff. Am. Compl. ¶¶ 47-48. Thereafter, on May 6, 1994, plaintiff filed this lawsuit.

Plaintiff's amended complaint contains several claims, three of which remain at issue. *See Jones*, 974 F.Supp. 712; Order of November 24, 1997. The first is a claim under 42 U.S.C. § 1983 in which plaintiff alleges that Governor Clinton, acting under color of state law, deprived her of her constitutional right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution by sexually harassing her. The second is a claim under 42 U.S.C. § 1985(3) in which plaintiff alleges that Governor Clinton and Ferguson conspired to deprive her of her rights to equal protection of the laws and of equal privileges and immunities under the laws. The third is a state law claim in which plaintiff asserts a claim of intentional infliction of emotional distress or outrage against Governor Clinton, based primarily on the alleged incident at the hotel but also encompassing subsequent alleged acts.

II.

The President moves for summary judgment on the following grounds: (1) plaintiff cannot show either *quid pro quo* or hostile work environment sexual harassment under § 1983 because (a) the record plainly demonstrates that plaintiff did not suffer any tangible job detriment for purposes of establishing a *quid pro quo* claim, let alone one caused by her

10

purported rejection of Mr. Clinton's alleged sexual advances, and (b) the alleged actions as described by plaintiff, even resolving all inferences and factual disputes in her favor, do not constitute severe or pervasive abusive conduct for purposes of establishing a hostile work environment claim; (2) if plaintiff's § 1983 claim fails, so too does her § 1985 conspiracy claim because (a) plaintiff has failed to show that any such conspiracy actually resulted in a deprivation of her constitutional rights, and (b) the undisputed facts do not show any agreement between Governor Clinton and Trooper Ferguson to deprive plaintiff of her constitutional rights; and (3) plaintiff's claim of intentional infliction of emotional distress or outrage fails because (a) by plaintiff's own testimony, the conduct at issue does not constitute intentional infliction of emotional distress or outrage under Arkansas law, and (b) plaintiff did not as a result of the alleged conduct suffer emotional distress so severe that no reasonable person could endure it. Ferguson, in turn, moves for summary judgment on grounds that (1) even if everything plaintiff has alleged were true, she does not have evidence to show either *quid pro quo* or hostile work environment sexual harassment, and (2) there was no conspiracy between the President and Ferguson to violate plaintiff's constitutional rights by sexually harassing her. The President and Ferguson both argue that there are no genuine issues of material fact with respect to any of these issues and that they are entitled to summary judgment as a matter of law.

### A.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## B.

As a preliminary matter, the Court rejects plaintiff's contention that this case involves equal protection claims based not only on sexual harassment, but also on sexual assault and offensive conduct in violation of laws other than Title VII, 42 U.S.C. §§ 2000e *et seq.* Pl.'s Opp'n to Def. Clinton's Mot. for Summ. J. at 23. In its August 22 Memorandum Opinion and Order, this Court recognized that a sexual assault can be a constitutional violation under § 1983, but concluded that plaintiff's allegations, even if true, were insufficient to state such a

claim. *See Jones*, 974 F.Supp. at 724-25 (citing *Haberthur v. City of Raymore, Mo.*, 119

F.3d 720 (8th Cir. 1997); *Reeve v. Oliver*, 41 F.3d 381 (8th Cir. 1994) (per curiam)).

Notwithstanding the unequivocal ruling of this Court, plaintiff, citing Fed.R.Evid. 413(d)(2),

(3), and (5),[8] now contends that she has an actionable claim of criminal sexual assault based on

the Governor's alleged actions in the Excelsior Hotel and cites as authority for this proposition

an Arkansas criminal statute proscribing sexual abuse in the first degree, Ark. Code Ann. § 5-

14-108.[9]  Pl.'s Opp'n to Def. Clinton's Mot. for Summ. J. at 23-24.

        The Court finds plaintiff's attempt to restate her sexual assault claim in the guise of an

equal protection claim to be no more meritorious now than when it was raised in the context of

a due process claim.  Although the Governor's alleged conduct, if true, may certainly be

characterized as boorish and offensive, even a most charitable reading of the record in this

case fails to reveal a basis for a claim of criminal sexual assault as there is no alleged conduct

that could be characterized as "forcible compulsion" or "sexual contact" for purposes of

establishing a claim under the provision cited by plaintiff.  *See* Ark. Code Ann. § 5-14-101

(2), (8) (defining "forcible compulsion" as "physical force or a threat, express or implied, of

death or physical injury to or kidnapping of any person," and defining "sexual contact" as "any

act of sexual gratification involving the touching, directly or through clothing, of the sex

---

[8] These provisions state that an "offense of sexual assault" includes a crime under the law of a state that involved "contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person," "contact, without consent, between the genitals or anus of the defendant and any part of another person's body," or "an attempt or conspiracy to engage in" such conduct.

[9] Under Ark. Code Ann. § 5-14-108(a)(1), a person commits sexual abuse in the first degree if "[h]e engages in sexual contact with another person by forcible compulsion."

13

organs, or buttocks, or anus of a person or the breast of a female").[10] There being no

actionable claim of criminal sexual assault under the facts of this case, the Court will proceed

to a determination of the issues relevant to plaintiff's claim of sexual harassment.

1.

The Equal Protection Clause of the Fourteenth Amendment confers a right to be free

from gender discrimination that is not substantially related to important governmental

objectives. *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) (citing *Davis v. Passman*,

442 U.S. 228, 234-35 (1979)). Applying this precept, courts have found that intentional

sexual harassment of employees by persons acting under color of state law violates the

Fourteenth Amendment and is actionable under § 1983. *Id.* (citing *Pontarelli v. Stone*, 930

F.2d 104, 113-14 (1st Cir. 1991); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th

Cir. 1986)). *See also Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir.

1997); *Whitney v. State of New Mexico*, 113 F.3d 1170, 1174 (10th Cir. 1997); *Kern v. City of

Rochester*, 93 F.3d 38, 43 (2nd Cir. 1996), *cert. denied*, 117 S.Ct. 1335 (1997). A plaintiff

wishing to sustain an equal protection claim of sexual harassment under the Fourteenth

Amendment must show both "sexual harassment" and an "intent" to harass based upon that

plaintiff's membership in a particular class of citizens — *i.e.*, male or female. *Trautvetter v.

Quick*, 916 F.2d 1140, 1149-50 (7th Cir. 1990). An individual plaintiff may pursue a sexual

---

[10] Plaintiff also cites *West v. State*, 719 S.W.2d 684 (Ark. 1986), as authority for her claim of criminal sexual assault. Plaintiff's reliance on *West* is misplaced as the defendant in that case "came up behind" the 15-year-old victim, "put his arms around her, put his hand over her left breast [cupping her breast firmly and squeezing it], and kissed the back of her neck." *Id.* at 686. The facts alleged by plaintiff in this case bear no material resemblance to those that were at issue in *West* and do not give rise to a claim of criminal sexual assault.

harassment claim under the Fourteenth Amendment based solely upon acts of harassment directed towards her, but such a claim must show an intent to harass because of her status as a female and not because of characteristics of her gender which are personal to her. *Id.* at 1151. *See also Bohen*, 799 F.2d at 1187; *Stafford v. State of Missouri*, 835 F.Supp. 1136, 1141 (W.D.Mo. 1993).

Although the President contends that plaintiff cannot establish that he acted under color of state law with the intent to discriminate against her on the basis of her gender, he states that he reserves those issues for trial, if necessary, and seeks summary judgment solely on the grounds of plaintiff's failure to prove that she was subjected to conduct that corresponds to sexual harassment under Title VII. Before discussing that issue, however, the Court must address plaintiff's argument that the essential elements of a sexual harassment claim under § 1983 do not correspond to those under Title VII (although she acknowledges there is some overlap) and that her burden of proof is something less than that required under Title VII. The Court rejects this argument.

Throughout the pendency of this lawsuit, this Court and the parties have been operating under the assumption, based on the clear weight of authority, that a § 1983 sexual harassment claim should be analyzed under the standards developed in similar Title VII litigation. *See, e.g., Trautvetter*, 916 F.2d at 1149 (noting that a claim of sexual harassment under § 1983 must generally satisfy the contours of a sexual harassment claim under Title VII); *Southard*, 114 F.3d 539 (applying Title VII standards to a § 1983 claim); *Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (noting that when § 1983 is used as a parallel remedy for violations of Title VII, the elements of the two causes of action are the same); *Beardsley*, 30

15

F.3d at 529 (noting that courts may apply the standards developed in Title VII litigation to

similar litigation under § 1983); *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 202 (6th

Cir. 1993) (noting that § 1983 and Title VII are largely parallel remedies in employment

discrimination suits and applying the same elements of *prima facie* proof for racially hostile

work environment to both Title VII and § 1983 claim).  Indeed, in her memorandum in

opposition to the President's motion for judgment on the pleadings (filed July 29, 1997), plaintiff

stated that "[a] sexual harassment claim brought pursuant to § 1983 is similar to a Title VII sexual

harassment claim" and cited *King v. Board of Regents of the Univ. of Wis. Sys.*, 898 F.2d 533,

537 (7th Cir. 1990), for the proposition that a § 1983 sexual harassment claim generally follows

the contours of a Title VII claim.  *See* Pl. Opp'n to Mot. for J. on the Pleadings at 8.  In this

regard, plaintiff recognized that courts have separated sexual harassment claims into two

categories — *quid pro quo* cases and hostile work environment cases — and represented to this

Court that her allegations, as analyzed under Title VII, were sufficient to state claims under

both categories.  Specifically, plaintiff stated with respect to her *quid pro quo* claim that sexual

harassment occurs when, among other things, "rejection of such conduct by an individual is used

as the basis for employment decisions," citing as support for this claim Title VII cases and

guidelines promulgated by the Equal Employment Opportunity Commission ("EEOC"), *see* Pl.

Opp'n to Mot. for J. on the Pleadings at 26, and stated with respect to her hostile environment

claim, again citing Title VII cases and EEOC guidelines, that "[u]nder section 1983, as under Title

VII, it is unlawful to create a sexually hostile or abusive work environment," *see id.* at 18.

Several of this Court's discovery rulings in favor of plaintiff were premised on this Court's

understanding and plaintiff's representations (in her complaint and elsewhere) that she was

16

asserting workplace harassment as understood in reference to Title VII standards, *i.e.*, that she suffered tangible job detriments for her refusal to submit to Governor Clinton's alleged advances. Based on plaintiff's prior representations and the clear weight of authority, the Court will look to Title VII in addressing plaintiff's *quid pro quo* and hostile work environment sexual harassment claims.[11]

a.

To make a prima facie case of *quid pro quo* sexual harassment, this plaintiff must show, among other things, that her refusal to submit to unwelcome sexual advances or requests for sexual favors resulted in a tangible job detriment. *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir. 1995) (citing *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 186 (6th Cir.), *cert. denied*, 506 U.S. 1041 (1992)). *See also Sanders v. Casa View Baptist Church*, 134 F.3d 331, 339 (5th Cir. 1998) (noting that to withstand summary judgment on *quid pro quo* claims, plaintiffs were required to produce evidence showing that the harassment complained of affected tangible aspects of their compensation, terms, conditions, or privileges of employment). "[A] supervisor's mere threat or promise of job-related harm or benefits in exchange for sexual favors does not constitute *quid pro quo* harassment ...." *Gary v. Long*, 59 F.3d 1391, 1396 (D.C.Cir. 1995).

---

[11] This is not to say that the standards under both § 1983 and Title VII are exactly the same. Among other things, a plaintiff under § 1983 must demonstrate that the defendant was acting under color of state law while Title VII requires no such showing. Thus, contrary to plaintiff's suggestion that her burden of proof under § 1983 is something less than what would be required of her under Title VII, a plaintiff's burden under § 1983 *exceeds* that under Title VII in most cases. *See, e.g., Guy v. State of Illinois*, 958 F.Supp. 1300, 1307 (N.D.Ill. 1997). Here, however, the President is not at this time contesting the issues of whether he acted under color of state law with the intent to discriminate against plaintiff on the basis of her gender.

i.

Apparently recognizing the infirm ground upon which her assertion of tangible job detriments rest (which will be discussed *infra*), plaintiff *first* argues that a showing of a tangible job detriment is not an essential element of an action for *quid pro quo* sexual harassment under Title VII.[12]  The Court rejects this argument as it conflicts with the Eighth Circuit's requirement that a refusal to submit to unwelcome sexual advances or requests for sexual favors resulted in a tangible job detriment, *see Cram*, 49 F.3d at 473, and conflicts with the majority of the other circuits on this point as well, including the recent decisions cited previously from the Fifth Circuit in *Sanders*, 134 F.3d 331, and the District of Columbia Circuit in *Gary*, 59 F.3d 1391.  *See also Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 783 (1st Cir. 1990) (concluding that it is the essence of *quid pro quo* harassment when an employee is subjected to unwelcome sexual advances by a supervisor and her reaction to these advances affects tangible aspects of her compensation, terms, conditions, or privileges of employment); *Spencer v. General Elec. Co.*, 894 F.2d 651, 659 (4th Cir. 1990) (*quid pro quo* claim requires that the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 579 (2nd Cir. 1989) (noting that the gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to

---

[12] Plaintiff's contention that she is not required to show a tangible job detriment is at odds with her representation made in her opposition to the President's motion for judgment on the pleadings (filed July 29, 1997), that sexual harassment occurs when, among other things, "rejection of such conduct by an individual is used as the basis for employment decisions." *See* Pl. Opp'n to Mot. for J. on the Pleadings at 26 (citing Title VII cases and guidelines promulgated by the EEOC).  Indeed, the primary basis of plaintiff's original and amended complaint is her contention that she suffered reprisals for her rejection of the Governor's alleged advances.

sexual blackmail and that adverse consequences follow from the employee's refusal); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir. 1987) (*quid pro quo* sexual harassment exists when adverse job consequences result from employee's refusal to submit to sexual advances); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564 (11th Cir. 1987) (*quid pro quo* claim requires that the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment); *Highlander v. K.F.C. Nat'l Management Co.*, 805 F.2d 644, 649 (6th Cir. 1986) (no cause of action for *quid pro quo* sexual harassment where "the record [is] totally devoid of any evidence tending to demonstrate that plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in the activity suggested by [defendant]").

Even without benefit of the settled authority requiring a showing of a tangible job detriment in *quid pro quo* cases, the three cases upon which plaintiff relies in support of her argument, *Nichols v. Frank*, 42 F.3d 503 (9th Cir. 1994), *Karibian v. Columbia Univ.*, 14 F.3d 773 (2nd Cir. 1994), and *Jansen v. Packaging Corp. of America*, 123 F.3d 490 (7th Cir. 1997) (en banc) (plurality), *cert. granted sub nom. Burlington Indus., Inc. v. Ellerth*, 118 S.Ct. 876 (Jan. 23, 1998), do not obviate the need for a showing of a tangible job detriment under the facts of this case. First, *Nichols* and *Karibian* were "submission" cases in which the victims of sexual harassment submitted to the unwelcome sexual advances. Plaintiff, by contrast, alleges that she *resisted* Governor Clinton's alleged advances and thereby suffered reprisals in her workplace. The court in *Karibian* recognized the distinction between so-called "submission" and "refusal" cases, noting that "[i]n the nature of things, evidence of economic harm will not be available to support the claim of the employee who submits to the

19

supervisor's demands." 14 F.3d at 778. Both *Nichols* and *Karibian* were addressing the

narrow situations before them in which the victim submitted to the demands for sexual favors

and do not stand for the proposition that a showing of a tangible job detriment is unnecessary

in a *quid pro quo* sexual harassment case where, as here, it is claimed that the alleged

advances were resisted.

While it is true that the Seventh Circuit in *Jansen* concluded that a "clear and

unambiguous" *quid pro quo* threat that "clearly conditions concrete job benefits or detriments

on compliance with sexual demands" can constitute an actionable claim "even if the threat

remains unfulfilled," 123 F.3d at 499, plaintiff acknowledges that no one, including Governor

Clinton, ever told her that if she refused to submit to his alleged advances it would have a

negative effect on her job, that she had to submit to his alleged advances in order to receive

job benefits, or that the Governor would use his relationship with AIDC Director Dave

Harrington to penalize her in her job. Pl.'s Depo. at 74-75. She merely states that "read[ing]

between the lines," she "knew what [the Governor] meant" when he allegedly indicated in the

hotel suite that Harrington was his good friend. *Id.* at 75-76. Be that as it may, the

Governor's alleged statements do not in any way constitute a clear threat that clearly

conditions concrete job benefits or detriments on compliance with sexual demands.[13]

Plaintiff's claim therefore would not survive a *Jansen* analysis, her "read[ing] between the

---

[13] For this reason, had plaintiff demonstrated adverse employment action, which she has not, the Court would not find the Governor's alleged statements to be sufficient evidence of a causal link between that harm and any alleged *quid pro quo* demands. *Cf. Cram*, 49 F.3d at 474 (statement by harasser that, "I'll get you for this," held to be insufficient to show enforcement of *quid pro quo* demand where there was no reference to plaintiff's job); *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 775-76 (6th Cir. 1996) (statement from harasser that he was "close friends" with individual who had impact on claimed adverse employment decisions held to be too attenuated to establish causation).

lines" notwithstanding.   123 F.3d at 499.[14]

Based on the foregoing, the Court finds that a showing of a tangible job detriment is an essential element of plaintiff's *quid pro quo* sexual harassment claim.   It is that issue to which the Court now turns.

ii.

As evidence of tangible job detriments (or adverse employment action),[15] plaintiff claims the following occurred after she resisted Governor Clinton's alleged advances on May 8, 1991: (1) she was discouraged from applying for more attractive jobs and seeking reclassification at a higher pay grade within the AIDC; (2) her job was changed to one with fewer responsibilities, less attractive duties and less potential for advancement – and the reason given for the change proved to be untrue; (3) she was effectively denied access to grievance procedures that would otherwise have been available to victims of sexual harassment; and (4) she was mistreated in ways having tangible manifestations, such as isolating her physically, making her sit in a location from which she was constantly watched, making her sit at her workstation with no work to do, and singling her out as the only female employee not to be

---

[14] Of course, it remains to be seen whether the holding of *Jansen* will survive review by the Supreme Court.

[15] Title VII prohibits an employer from discriminating "against any individual with respect to the compensation, terms, conditions, or privileges of employment" on the basis of sex, or from limiting, segregating, or classifying employees on the basis of sex "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee...."  42 U.S.C. § 2000e-2(a)(1)-(2).  The concept of "tangible job detriment" as used in *quid pro quo* cases and the concept of "adverse employment action" as used in retaliation cases both derive from the basic prohibition of employment discrimination set forth in § 2000e-2(a)(1)-(2), *see Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir. 1997), and thus correspond to one another.  *See Sanders*, 134 F.3d at 339; *Bryson v. Chicago State Univ.*, 96 F.3d 912, 916 (7th Cir. 1996); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir. 1987).  Accordingly, this Court has looked to cases discussing both concepts in addressing the issues in this case.

given flowers on Secretary's Day.  The Court has carefully reviewed the record in this case and finds nothing in plaintiff's employment records, her own testimony, or the testimony of her supervisors showing that plaintiff's reaction to Governor Clinton's alleged advances affected tangible aspects of her compensation, terms, conditions, or privileges of employment.

1.

Plaintiff's claim that she was discouraged from applying for more attractive jobs and seeking reclassification at a higher pay grade within the AIDC does not demonstrate any "tangible" job detriment as she has not identified a single specific job which she desired or applied for at AIDC but which she had been discouraged from seeking.  Pl.'s Depo. at 37-40. When asked for such specific information, plaintiff merely testified that the unidentified jobs she sought were "a grade higher" but that her supervisor "would always discourage me and make me believe that I could grow within the administrative services, which in fact I didn't.  I got degrade – downgraded."  *Id.* at 38, 42.  She further states that those "few" times that she would talk to her supervisor and receive discouragement, she "would go ahead and fill out an application maybe or something."  *Id.* at 41.  There is no record of plaintiff ever applying for another job within AIDC, however, and the record shows that not only was plaintiff never downgraded, her position was reclassified *upward* from a Grade 9 classification to a Grade 11 classification, thereby increasing her annual salary.  Pennington Aff. ¶ 6; Arkansas Human Resources Management System Payroll Data Form for P. R. Jones, Ex. B-7.  Indeed, it is undisputed that plaintiff received every merit increase and cost-of-living allowance for which she was eligible during her nearly two-year tenure with the AIDC and consistently received

22

satisfactory job evaluations. *See id.* Specifically, on July 1, 1991, less than two months after the alleged incident that is the subject of this lawsuit, plaintiff received a cost-of-living increase and her position was reclassified from Grade 9 to Grade 11; on August 28, 1991, plaintiff received a satisfactory job evaluation from her supervisor, Clydine Pennington; on March 11, 1992, the one-year anniversary of her hire date with AIDC, plaintiff received another satisfactory evaluation from Pennington and Cherry Duckett, Deputy Director of AIDC, which entitled her to a merit raise. *Id.* In addition, plaintiff was given a satisfactory job review in an evaluation covering the period of March 1992 until her voluntary departure from the AIDC in February 1993. Ex. B-6. Plaintiff signed this review on February 16, 1993, *see id.*, and would have received another merit increase one month later in accordance with this review had she elected to continue her employment at AIDC. Pennington Aff. ¶ 8.

It is plaintiff's burden to come forward with "specific facts" showing that there is a genuine issue for trial, *see Matsushita*, 475 U.S. at 587, and the Court finds that her testimony on this point, being of a most general and non-specific nature (and in some cases contradictory to the record), simply does not suffice to create a genuine issue of fact regarding any tangible job detriment as a result of her having allegedly been discouraged from seeking more attractive jobs and reclassification. *Cf. Splunge v. Shoney's, Inc.*, 874 F.Supp. 1258, 1271 (M.D.Ala. 1994) (where plaintiff claimed that she never specifically requested a promotion or raise because it would have been futile as she had not surrendered to supervisor's harassment, court held this was insufficient to create a genuine issue of material fact regarding denial of economic benefits as it was "a mere inference based on speculation and conjecture").

2.

Equally without merit is plaintiff's assertion that following her return from maternity leave in September 1992, she suffered a tangible job detriment when her job was changed to one with fewer responsibilities, less attractive duties and less potential for advancement.[16] These matters do not constitute a tangible job detriment as it is undisputed that there was no diminution in plaintiff's salary or change in her job classification following her return from maternity leave and, further, that her last review at AIDC following her return was positive and would have entitled her to another merit increase had she not resigned her position in order to move to California with her husband.  Changes in duties or working conditions that cause no materially significant disadvantage, such as diminution in title, salary, or benefits, are insufficient to establish the adverse conduct required to make a *prima facie* case.  *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).

Although plaintiff states that her job title upon returning from maternity leave was no longer that of purchasing assistant and that this change in title impaired her potential for promotion, her job duties prior to taking maternity leave and her job duties upon returning to work both involved data input; the difference being that instead of responsibility for data entry of AIDC purchase orders and driving records, she was assigned data entry responsibilities for employment applications.  Pl.'s Depo. at 56; Pennington Aff. ¶ 16.  That being so, plaintiff

---

[16] Plaintiff originally claimed that the job in which she was placed called for a higher grade and pay, but that she was not paid more money than she received in her previous position and never received a raise beyond a cost of living increase, even though other employees received merit increases.  Am. Compl. ¶ 39.  That claim apparently has been abandoned as it is not mentioned in plaintiff's response to the President's motion for summary judgment.  The Court notes that plaintiff apparently never reviewed her employment records at AIDC prior to filing suit in May 1994 and had not done so prior to her deposition.  Pl.'s Depo. at 33, 76.

cannot establish a tangible job detriment. A transfer that does not involve a demotion in form or substance and involves only minor changes in working conditions, with no reduction in pay or benefits, will not constitute an adverse employment action, "[o]therwise every trivial personnel action that an irritable ... employee did not like would form the basis of a discrimination suit." *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)). *See also Montandon v. Farmland Indus. Inc.*, 116 F.3d 355, 359 (8th Cir. 1997) (requirement that an employee move to another town with the same employer did not rise to the level of an adverse employment action, irrespective of how unpalatable it may have been to the employee, where there was no change in position, title, salary, or any other aspect of his employment). Whether or not the reasons given for the change were untrue, plaintiff's allegations describe nothing "more disruptive than a mere inconvenience or an alteration of job responsibilities." *See Harlston*, 37 F.3d at 382 (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).[17]

3.

The Court also rejects plaintiff's claim that she was effectively denied access to grievance procedures that would otherwise have been available to victims of sexual harassment. Plaintiff merely states that from her "perspective," it "appeared very unlikely that any good would come from pursuing a grievance," and that "it was natural for her to conclude

---

[17] Plaintiff offers no evidence that her previous position conferred some type of status or prestige not conferred in her subsequent position, and she offers no evidence that the change in her duties impaired her ability to advance in her career.

that invoking the grievance procedure would be futile and perhaps worse." Pl.'s Opp'n to Def. Clinton's Mot. for Summ. J. at 40-41, 47.  As the Court has previously noted, however, plaintiff acknowledges that she was never threatened with adverse employment action if she did not submit to the Governor's alleged advances, but that she was only "read[ing] between the lines."  Pl.'s Depo. at 75-76.  Such subjective perceptions and beliefs regarding the efficacy of invoking any grievance procedures are nothing more than "speculation and conjecture" and do not constitute a tangible job detriment.  *Splunge*, 874 F.Supp. at 1271. *See also Cram*, 49 F.3d at 474 (plaintiff's subjective belief that defendant had threatened job retaliation did not state a claim of *quid pro quo* sexual harassment).

4.

Finally, the Court rejects plaintiff's claim that she was subjected to hostile treatment having tangible effects when she was isolated physically, made to sit in a location from which she was constantly watched, made to sit at her workstation with no work to do, and singled out as the only female employee not to be given flowers on Secretary's Day.  Plaintiff may well have perceived hostility and animus on the part of her supervisors,[18] but these perceptions are merely conclusory in nature and do not, without more, constitute a tangible job detriment.  Absent evidence of some more tangible change in duties or working conditions that constitute a material employment disadvantage, of which the Court has already determined does not exist, general allegations of hostility and personal animus are not sufficient to demonstrate any

---

[18] Plaintiff states "there was a lot of hostility it seemed like between Cherry Duckett and I," and that Pennington was "not as friendly as she used to have been." Pl.'s Depo. at 35, 45.

adverse employment action that constitutes the sort of ultimate decision intended to be

actionable under Title VII. *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692-93 (8th

Cir. 1997) (citing *Ledergerber*, 122 F.3d at 1144; *Montandon*, 116 F.3d at 359).

Similarly, plaintiff's allegations regarding her work station being moved so that she had

to sit directly outside Pennington's office and, at times, not having work to do,[19] describe

nothing more than minor or *de minimis* personnel matters which, again without more, are

insufficient to constitute a tangible job detriment or adverse employment action. *Cf. Hicks v.*

*Brown*, 929 F.Supp. 1184, 1190 (E.D.Ark. 1996) (case in which this Court found no adverse

employment action, notwithstanding allegations of a pattern of negative or adverse actions

taken against the plaintiff − including a critical E-Mail from plaintiff's supervisor, verbal

counseling of plaintiff by her supervisor, and a low rating on plaintiff's proficiency report −

where no financial harm, termination, or suspension had occurred).

Although it is not clear why plaintiff failed to receive flowers on Secretary's Day in

1992, such an omission does not give rise to a federal cause of action in the absence of

evidence of some more tangible change in duties or working conditions that constitute a

material employment disadvantage. *See Manning*, 127 F.3d at 692-93.


iii.

In sum, the Court finds that a showing of a tangible job detriment or adverse

employment action is an essential element of plaintiff's § 1983 *quid pro quo* sexual harassment

---

[19] Plaintiff makes this allegation even though she testified that following her return from maternity leave, she input data pursuant to her new responsibilities "all day long." Pl.'s Depo. at 56.

claim and that plaintiff has not demonstrated any tangible job detriment or adverse employment action for her refusal to submit to the Governor's alleged advances. The President is therefore entitled to summary judgment on plaintiff's claim of *quid pro quo* sexual harassment.

b.

The Court now turns to plaintiff's hostile work environment claim. Unlike *quid pro quo* sexual harassment, hostile work environment harassment arises when "sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Cram*, 49 F.3d at 474 (quoting *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1013 (8th Cir. 1988)). To prevail on a hostile work environment cause of action, a plaintiff must establish, among other things, that she was subjected to unwelcome sexual harassment based upon her sex that affected a term, condition, or privilege of employment. *Callanan v. Runyun*, 75 F.3d 1293, 1296 (8th Cir. 1996). *See also Todd v. Ortho Biotech, Inc.*, — F.3d —, 1998 WL 92207, *2 (8th Cir. March 5, 1998); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir. 1997); *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996). The behavior creating the hostile working environment need not be overtly sexual in nature, but it must be "'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Cram*, 49 F.3d at 474 (quoting *Hall*, 842 F.2d at 1014). The harassment must also be sufficiently severe or pervasive "to alter the conditions of employment and create an abusive working environment." *Id.* (quoting *Meritor Sav. Bank v. Vinson*, 477

28

U.S. 57, 67 (1986)).  *See also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

The President essentially argues that aside from the alleged incident at the Excelsior

Hotel, plaintiff alleges only two other contacts with him, alleges only a few additional contacts

with Ferguson, and contains conclusory claims that plaintiff's supervisors were rude.  He

argues that taken individually or as a whole, these contacts do not in any way constitute the

kind of pervasive, intimidating, abusive conduct that courts require to establish a hostile work

environment claim.  The Court agrees.

In assessing the hostility of an environment, a court must look to the totality of the

circumstances.  *Stacks v. Southwestern Bell Yellow Pages*, 27 F.3d 1316, 1327 (8th Cir. 1994).

Circumstances to be considered include "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S.

at 23.  No single factor is determinative, *see id.,* and the court "should not carve the work

environment into a series of discrete incidents and then measure the harm occurring in each

episode."  *Burns v. McGregor Elec. Indus., Inc.*, 955 F.2d 559, 564 (8th Cir.1992).

First, the Court finds plaintiff's reliance on her assertions of tangible job detriment as

establishing a hostile work environment, *see* Pl.'s Opp'n to Def. Clinton's Mot. for Summ. J.

at 51, to be misplaced.  In its August 22 Memorandum Opinion and Order, the Court noted

that although the President's argument for outright dismissal of plaintiff's hostile work

environment claim had "some force," further development of the record was nevertheless

necessary.  *Jones*, 974 F.Supp. at 724.  The Court based this conclusion in large part on

plaintiff's representations that her rejection of the President's alleged advances caused her to

29

suffer adverse employment actions, including being transferred to a position that had no

responsible duties for which she could be adequately evaluated to earn advancement and failing

to receive raises and merit increases. *Id.* In this regard, the Court determined that the

"totality" of the allegations alleged in this case were such that they could be said to have

altered the conditions of plaintiff's employment and created an abusive work environment. *Id.*

However, development of the record has now established that plaintiff's allegations of adverse

employment actions are without merit, *see* Section II(b)(2)(a)(ii), *supra*, with her claim of

failing to receive cost of living increases apparently having even been abandoned. *See id.* at

n.16. Plaintiff received every merit increase and cost-of-living allowance for which she was

eligible during her nearly two-year tenure with the AIDC, her job was upgraded from Grade 9

to Grade 11 (thereby increasing her salary), she consistently received satisfactory job

evaluations, and her job responsibilities upon her return from maternity leave were not

significantly different from prior to her taking leave and did not cause her any materially

significant disadvantage. These facts are clearly established by the record and dispel the

notion that she was subjected to a hostile work environment.

Plaintiff certainly has not shown under the totality of the circumstances that the alleged

incident in the hotel and her additional encounters with Ferguson and the Governor were so

severe or pervasive that it created an abusive working environment. *Callanan*, 75 F.3d at

1296. She admits that she never missed a day of work following the alleged incident in the

hotel, she continued to work at AIDC another nineteen months (leaving only because of her

husband's job transfer), she continued to go on a daily basis to the Governor's Office to

deliver items and never asked to be relieved of that duty, she never filed a formal complaint or

told her supervisors of the incident while at AIDC, and she never consulted a psychiatrist,

psychologist, or incurred medical bills as a result of the alleged incident.  Pl.'s Depo. at 44-

45, 48, 62, 121-23.  In addition, plaintiff has not shown how Ferguson's alleged comments,

whether considered alone or in conjunction with the other alleged conduct in this case,

interfered with her work, and she acknowledges that the Governor's statement about him and

her looking like "beauty and the beast" was made "in a light vein" and that his patting her on

the shoulder and asking her how she was doing was done in a "friendly fashion."  Pl.'s Depo.

at 243, 245.

  While the alleged incident in the hotel, if true, was certainly boorish and offensive, the

Court has already found that the Governor's alleged conduct does not constitute sexual assault.

*See* Section II(B), *infra.*  This is thus not one of those exceptional cases in which a single

incident of sexual harassment, such as an assault, was deemed sufficient to state a claim of

hostile work environment sexual harassment.  *Cf. Crisonino v. New York City Housing Auth.*,

985 F.Supp. 385 (S.D.N.Y. 1997) (supervisor called plaintiff a "dumb bitch" and "shoved her

so hard that she fell backward and hit the floor, sustaining injuries from which she has yet to

fully recover").

  Considering the totality of the circumstances, it simply cannot be said that the conduct

to which plaintiff was allegedly subjected was frequent, severe, or physically threatening, and

the Court finds that defendants' actions as shown by the record do not constitute the kind of

sustained and nontrivial conduct necessary for a claim of hostile work environment.  *Cf. Lam*

*v. Curators of the Univ. of Mo.*, 122 F.3d 654, 656-57 (8th Cir. 1997) (noting that single

exposure to offensive videotape was not severe or pervasive enough to create hostile

31

environment); *Montandon,* 116 F.3d at 358 (exposure to offensive behavior by supervisor on one instance does not satisfy "severe or pervasive" requirement under Title VII); *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (7th Cir. 1997) (five sexually-oriented incidents spread out over the course of 16 months not sufficiently severe or pervasive enough to create hostile work environment); *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir. 1993) ("relatively limited" instances of unwanted sexual advances, which included the supervisor placing his hand on plaintiff's leg above the knee several times, rubbing his hand along her upper thigh, kissing her several seconds, and "lurch[ing] at her from behind some bushes," did not create an objectively hostile work environment).

In sum, the Court finds that the record does not demonstrate conduct that was so severe or pervasive that it can be said to have altered the conditions of plaintiff's employment and created an abusive working environment. Accordingly, the President is entitled to summary judgment on plaintiff's claim of hostile work environment sexual harassment.

2.

The Court now turns to plaintiff's § 1985(3) conspiracy claim. In order to prove the existence of a civil rights conspiracy under § 1985(3), a plaintiff must prove, among other things, that another person was injured in his person or property or deprived of having and exercising any right or privilege of a citizen in the United States. *Larson v. Miller,* 76 F.3d 1446, 1454 (8th Cir. 1996) (en banc). "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great American Fed. Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 372 (1979).

32

Plaintiff does not have a viable § 1985(3) claim in this case as the Court has determined

that her § 1983 *quid pro quo* and hostile work environment sexual harassment claims are

without merit and warrant a grant of summary judgment. Absent an underlying violation of

federal law, there can be no actionable claim alleging a conspiracy to achieve that end. *See*

*Larson*, 76 F.3d at 1456 (noting that where there was no evidence from which a jury could

conclude that any injury to or deprivation of the plaintiff's constitutional rights actually

occurred, there was no § 1985(3) conspiracy claim); *Wiggins v. Hitchens*, 853 F.Supp. 505,

511 (D.D.C. 1994) (noting that "[t]here can be no recovery under section 1985(3) absent a

violation of a substantive federal right"); *Escamilla v. City of Santa Ana*, 606 F.Supp. 928,

934 (C.D.Ca. 1985) (noting that "[t]here can be no action for conspiracy under 42 U.S.C. §

1985 or for failure to prevent a conspiracy under 42 U.S.C. § 1986 when no civil rights

violation has occurred"), *aff'd*, 796 F.2d 266 (9th Cir. 1986); *Garrison v. Burke*, 1997 WL

37909, *10 (N.D.Ill. Jan. 27, 1997) (where there was no underlying deprivation of equal

protection, plaintiff was precluded from establishing § 1985(3) claim as there was no showing

of injury to person or property).

### 3.

Finally, the Court addresses plaintiff's state law claim of intentional infliction of

emotional distress or outrage.[20] Arkansas recognizes a claim of intentional infliction of

emotional distress based on sexual harassment. *Davis v. Tri-State Mack Distribs., Inc.*, 981

---

[20] Under Arkansas law, the tort of intentional infliction of emotional distress and the tort of outrage are essentially the same causes of action and are governed by the same standards. *See, e.g., Hamaker v. Ivy*, 51 F.3d 108, 110 n. 2 (8th Cir. 1995); *Ross v. Patterson*, 817 S.W.2d 418, 420 (Ark. 1991).

F.2d 340, 342 (8th Cir. 1992) (citing *Hale v. Ladd*, 826 S.W.2d 244 (Ark. 1992)). To

establish a claim of intentional infliction of emotional distress, a plaintiff must prove that: (1)

the defendant intended to inflict emotional distress or knew or should have known that

emotional distress was the likely result of his conduct; (2) the conduct was extreme and

outrageous and utterly intolerable in a civilized community; (3) the defendant's conduct was

the cause of the plaintiff's distress; and (4) the plaintiff's emotional distress was so severe in

nature that no reasonable person could be expected to endure it. *Milam v. Bank of Cabot*, 937

S.W.2d 653, 658 (Ark. 1997); *Hollomon v. Keadle*, 931 S.W.2d 413, 415 (Ark. 1996);

*Cherepski v. Walker*, 913 S.W.2d 761, 767 (Ark. 1996); *Croom v. Younts*, 913 S.W.2d 283,

286 (Ark. 1996).

The President argues that the alleged conduct of which plaintiff complains was brief

and isolated; did not result in any physical harm or objective symptoms of the requisite severe

distress; did not result in distress so severe that no reasonable person could be expected to

endure it; and he had no knowledge of any special condition of plaintiff that would render her

particularly susceptible to distress. He argues that plaintiff has failed to identify the kind of

clear cut proof that Arkansas courts require for a claim of outrage and that he is therefore

entitled to summary judgment. The Court agrees.[21]

One is subject to liability for the tort of outrage or intentional infliction of emotional

---

[21] In denying the President's motion for judgment on the pleadings on this claim, the Court noted that the totality of the alleged conduct on which plaintiff based her lawsuit, including her claim that her rejection of the President's alleged advances caused her to suffer adverse employment actions, could, if true, be regarded as sufficient to state a claim of intentional infliction of emotional distress. *See Jones*, 974 F.Supp. at 730. For the reasons previously stated, however, it is now apparent that plaintiff's claims have not borne fruit. The record upon which this Court is now addressing plaintiff's claim of outrage – indeed, all her claims – is far different from the record that was before the Court last August.

distress if he or she wilfully or wantonly causes severe emotional distress to another by extreme and outrageous conduct. *Sterling Drug Inc. v. Oxford*, 743 S.W.2d 380, 382 (Ark. 1988). *See also Ingram v. Pirelli Cable Corp.*, 747 S.W.2d 103, 105 (Ark. 1988). In *M.B.M. Co. v. Counce*, 596 S.W.2d 681, 687 (Ark. 1980), the Arkansas Supreme Court stated that "[b]y extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." Whether conduct is "extreme and outrageous" is determined by looking at "the conduct at issue; the period of time over which the conduct took place; the relation between plaintiff and defendant; and defendant's knowledge that plaintiff is particularly susceptible to emotional distress by reason of some physical or mental peculiarity." *Doe v. Wright*, 82 F.3d 265, 269 (8th Cir. 1996) (citing *Hamaker*, 51 F.3d at 111). The tort is clearly not intended to provide legal redress for every slight insult or indignity that one must endure. *Manning*, 127 F.3d at 690 (citing *Hamaker*, 51 F.3d at 110). The Arkansas courts take a strict approach and give a narrow view to claims of outrage, *see id.*, and merely describing conduct as outrageous does not make it so. *Ross*, 817 S.W.2d at 420.

Plaintiff seems to base her claim of outrage on her erroneous belief that the allegations she has presented are sufficient to constitute criminal sexual assault. She states that "Mr. Clinton's outrageous conduct includes offensive language, an offensive proposition, offensive touching (constituting sexual assault under both federal and state definitions), and *actual exposure of an intimate private body part*," and that "[t]here are few more outrageous acts than a criminal sexual assault followed by unwanted exposure, coupled with a demand for oral sex

35

by the most powerful man in the state against a very young, low-level employee." Pl.'s Opp'n
to Def. Clinton's Mot. for Summ. J. at 66 (emphasis in original).

While the Court will certainly agree that plaintiff's allegations describe offensive
conduct, the Court, as previously noted, has found that the Governor's alleged conduct does
not constitute sexual assault. Rather, the conduct as alleged by plaintiff describes a mere
sexual proposition or encounter, albeit an odious one, that was relatively brief in duration, did
not involve any coercion or threats of reprisal, and was abandoned as soon as plaintiff made
clear that the advance was not welcome. The Court is not aware of any authority holding that
such a sexual encounter or proposition of the type alleged in this case, without more, gives rise
to a claim of outrage. *Cf. Croom*, 913 S.W.2d 287 (use of wine and medication by a vastly
older relative to foist sex on a minor cousin went "beyond a mere sexual encounter" and
offended all sense of decency).

Moreover, notwithstanding the offensive nature of the Governor's alleged conduct,
plaintiff admits that she never missed a day of work following the alleged incident, she
continued to work at AIDC another nineteen months (leaving only because of her husband's
job transfer), she continued to go on a daily basis to the Governor's Office to deliver items and
never asked to be relieved of that duty, she never filed a formal complaint or told her
supervisors of the incident while at AIDC, she never consulted a psychiatrist, psychologist, or
incurred medical bills as a result of the alleged incident, and she acknowledges that her two
subsequent contacts with the Governor involved comments made "in a light vein" and
nonsexual contact that was done in a "friendly fashion." Further, despite earlier claiming that
she suffered marital discord and humiliation, plaintiff stated in her deposition that she was not

claiming damages to her marriage as a result of the Governor's alleged conduct, *see* Pl.'s

Depo. at 122, and she acknowledged the request to drop her claim of injury to reputation by

stating, "I didn't really care if it was dropped or not personally." *Id*. at 261-62.   Plaintiff's

actions and statements in this case do not portray someone who experienced emotional distress

so severe in nature that no reasonable person could be expected to endure it. *Cf. Hamaker*, 51

F.3d 108 (no claim of outrage where plaintiff, who had a speech impediment and an I.Q. of

between 75 and 100, was "red-faced and angry," had an "increased heart rate and blood

pressure," and had trouble sleeping four days after incident involving "rather nasty" practical

joke).

Nevertheless, plaintiff submits a declaration from a purported expert with a Ph.D in

education and counseling, Patrick J. Carnes, who, after a 3.5 hour meeting with plaintiff and her

husband a mere four days prior to the filing of President Clinton's motion for summary judgment,

opines that her alleged encounter with Governor Clinton in 1991, "and the ensuing events," have

caused plaintiff to suffer severe emotional distress and "consequent sexual aversion."   The Court

does not credit this declaration.

In *Angle v. Alexander*, 945 S.W.2d 933 (Ark. 1997), the Arkansas Supreme Court noted

that absent physical harm, courts look for more in the way of extreme outrage as an assurance

that the mental disturbance claimed is not fictitious. *Id.* at 936-37.   In that case, the plaintiffs

offered their own testimony that they had experienced emotional distress, thoughts of death, fear,

anger, and worry, but little else. *Id.*   In concluding that there was no evidence of extreme

emotional distress required to prevail on an outrage claim, the Court found it significant that none

had seen a physician or mental health professional for these concerns. *Id.*   The Court did not

37

allow the fact that one plaintiff "on the advice of her attorney, spoke to a psychologist," to overcome her failure of proof on this point. *Id.* at 937 n.3.

Aside from other deficiencies with the Carnes' declaration (including the fact that the substance of this declaration apparently was not disclosed in accordance with rules governing pre-trial discovery), the opinions stated therein are vague and conclusory and, as in *Angle*, do not suffice to overcome plaintiff's failure of proof on her claim of outrage. *Cf. Crenshaw v. Georgia-Pacific Corp.*, 915 F.Supp. 93, 99 (W.D.Ark. 1995) (affidavit prepared after opposing motion for summary judgment filed detailing symptoms of weight loss, lack of sleep, headache, worry, and nausea, failed to present sufficient evidence of emotional distress).

In sum, plaintiff's allegations fall far short of the rigorous standards for establishing a claim of outrage under Arkansas law and the Court therefore grants the President's motion for summary judgment on this claim.

### III.

One final matter concerns alleged suppression of pattern and practice evidence. Whatever relevance such evidence may have to prove other elements of plaintiff's case, it does not have anything to do with the issues presented by the President's and Ferguson's motions for summary judgment, *i.e.*, whether plaintiff *herself* was the victim of alleged *quid pro quo* or hostile work environment sexual harassment, whether the President and Ferguson conspired to deprive *her* of her civil rights, or whether *she* suffered emotional distress so severe in nature that no reasonable person could be expected to endure it. Whether other women may have been subjected to workplace harassment, and whether such evidence has allegedly been

38

suppressed, does not change the fact that plaintiff has failed to demonstrate that *she* has a case worthy of submitting to a jury. Reduced to its essence, the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party and the Court therefore finds that there are no genuine issues for trial in this case.

## IV.

For the foregoing reasons, the Court finds that the President's and Ferguson's motions for summary judgment should both be and hereby are granted. There being no remaining issues, the Court will enter judgment dismissing this case.

IT IS SO ORDERED this 1st day of April 1998.

_____
UNITED STATES DISTRICT JUDGE

THIS DOCUMENT ENTERED ON DOCKET SHEET IN
COMPLIANCE WITH RULE 58 AND/OR 79(a) FRCP
ON _4/1/98_____ BY _____

39

F I L E   C O P Y

vjt

UNITED STATES DISTRICT COURT
Eastern District of Arkansas
U.S. Post Office & Court House
600 West Capitol, Suite 402
Little Rock, Arkansas 72201-3325


April 1, 1998


\* \* MAILING CERTIFICATE OF CLERK \* \*


Re:  4:94-cv-00290.


True and correct copies of the attached were mailed by the clerk to the
following:


Robert Batton, Esq.
Attorney at Law
1414 West Main
Jacksonville, AR  72076

Bill W. Bristow, Esq.
Seay & Bristow
216 East Washington Avenue
Jonesboro, AR  72401-3185

Stephen C. Engstrom, Esq.
Wilson, Engstrom, Corum & Coulter
809 West Third Street
Post Office Box 71
Little Rock, AR  72203-0071

Kathlyn Graves, Esq.
Wright, Lindsey & Jennings
200 West Capitol Avenue
Suite 2200
Little Rock, AR  72201-3699

Robert S. Bennett, Esq.
Skadden, Arps, Slate, Meaghen & Flom
1440 New York Avenue N.W.
Washington, DC  20005

Robert E. Rader Jr., Esq.
Rader, Campbell, Fisher & Pyke
Stemmons Place
2777 Stemmons Freeway
Suite 1080
Dallas, TX  75207

James McCord Wilson, Esq.

Rader, Campbell, Fisher & Pyke
Stemmons Place
2777 Stemmons Freeway
Suite 1080
Dallas, TX  75207

David M. Pyke, Esq.
Rader, Campbell, Fisher & Pyke
Stemmons Place
2777 Stemmons Freeway
Suite 1080
Dallas, TX  75207

James Austin Fisher, Esq.
Rader, Campbell, Fisher & Pyke
Stemmons Place
2777 Stemmons Freeway
Suite 1080
Dallas, TX  75207

Donovan Campbell Jr., Esq.
Rader, Campbell, Fisher & Pyke
Stemmons Place
2777 Stemmons Freeway
Suite 1080
Dallas, TX  75207

Thomas Wesley Holmes, Esq.
Rader, Campbell, Fisher & Pyke
Stemmons Place
2777 Stemmons Freeway
Suite 1080
Dallas, TX  75207

cc: press

James W. McCormack, Clerk

Date: _4/1/98_____

BY: _Vicki Turner_