IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

APR 1 2 1999

JAMES W. McCORMACK, CLERK
By: _James McCormack_
CLERK

PAULA CORBIN JONES,             *
                                *
            Plaintiff,          *
                                *
vs.                             *       No. LR-C-94-290
                                *
                                *
                                *
WILLIAM JEFFERSON CLINTON       *
and DANNY FERGUSON,             *
                                *
            Defendants.         *

## MEMORANDUM OPINION AND ORDER

What began as a civil lawsuit against the President of the United States for alleged sexual harassment eventually resulted in an impeachment trial of the President in the United States Senate on two Articles of Impeachment for his actions during the course of this lawsuit and a related criminal investigation being conducted by the Office of the Independent Counsel ("OIC"). The civil lawsuit was settled while on appeal from this Court's decision granting summary judgment to defendants and the Senate acquitted the President of both Articles of Impeachment. Those proceedings having concluded, the Court now addresses the issue of contempt on the part of the President first raised in footnote five of the Court's Memorandum and Order of September 1, 1998. *See Jones v. Clinton*, 12 F.Supp.2d 931, 938 n.5 (E.D.Ark. 1998). For the reasons that follow, the Court hereby adjudges the President to be in contempt of court for his willful failure to obey this Court's discovery Orders.

**4 7 9**

## I.

Plaintiff Paula Corbin Jones filed this lawsuit seeking civil damages from William Jefferson Clinton, President of the United States, and Danny Ferguson, a former Arkansas State Police Officer, for alleged actions beginning with an incident in a hotel suite in Little Rock, Arkansas on May 8, 1991, when President Clinton was Governor of the State of Arkansas. Plaintiff was working as a state employee on the day in question and claimed that Ferguson persuaded her to leave the registration desk she was staffing and visit Governor Clinton in a business suite at the hotel. She claimed the Governor made boorish and offensive sexual advances that she rejected,[1] and that her superiors at work subsequently dealt with her in a hostile and rude manner and punished her in a tangible way for rejecting those advances.[2]

Plaintiff's complaint was filed on May 6, 1994. On August 10, 1994, the President filed a motion to dismiss the complaint without prejudice on grounds of immunity and to toll any statutes of limitations until he is no longer President, thereby allowing plaintiff to refile her suit after he is out of office. On December 28, 1994, this Court denied the President's motion to dismiss on immunity grounds and ruled that discovery in the case could proceed, but concluded that any trial should be stayed until such time as the President is no longer in office. *See Jones v.*

---

[1] Although the President's alleged conduct was certainly "outrageous" as that term is commonly understood, plaintiff failed to establish that the President's alleged conduct met the requirements of the *tort of outrage* which, under Arkansas law, requires that a plaintiff prove that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous and utterly intolerable in a civilized community; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the plaintiff's emotional distress was so severe in nature that no reasonable person could be expected to endure it. See *Jones v. Clinton*, 990 F.Supp. 657, 676 (E.D.Ark. 1998).

[2] Additional detail on the factual background of this case can be found in the Court's Memorandum Opinion and Order of April 1, 1998. *See Jones v. Clinton*, 990 F.Supp. 657.

*Clinton*, 869 F.Supp. 690 (E.D.Ark. 1994). Both parties appealed. On January 9, 1996, a divided panel of the Court of Appeals for the Eighth Circuit affirmed this Court's Order denying the President's motion to dismiss on immunity grounds and allowing discovery to proceed, but reversed this Court's Order staying the trial of this matter for the duration of President Clinton's term in office. *See Jones v. Clinton*, 72 F.3d 1354 (8ᵗʰ Cir. 1996). The President subsequently filed a petition for certiorari with the Supreme Court of the United States, which was granted, *see Clinton v. Jones*, 518 U.S. 1016 (1996), and on May 27, 1997, the Supreme Court handed down an opinion holding that there is no constitutional impediment to allowing plaintiff's case to proceed while the President is in office. *See Clinton v. Jones*, 520 U.S. 681 (1997).

Following remand of the case to this Court, the President, joined by Ferguson, filed a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). By Memorandum Opinion and Order dated August 22, 1997, this Court granted in part and denied in part the President's motion. *See Jones v. Clinton*, 974 F.Supp. 712 (E.D.Ark. 1997). The Court dismissed plaintiff's defamation claim against the President, dismissed her due process claim for deprivation of a property interest in her State employment, and dismissed her due process claims for deprivation of a liberty interest based on false imprisonment and injury to reputation, but concluded the remaining claims in plaintiff's complaint stated viable causes of action. *See id.* The Court thereupon issued a Scheduling Order setting forth a deadline of January 30, 1998, for the completion of discovery and the filing of motions.

Discovery in this case proved to be contentious and time-consuming. During the course

3

of discovery, over 50 motions were filed, the Court entered some 30 Orders,[3] and phone

conferences were held on an almost weekly basis to address various disputes and resolve

motions. In addition, the Court traveled to Washington, D.C. at the request of the President to

preside over his civil deposition on January 17, 1998. It was at a hearing on January 12, 1998, to

address issues surrounding the President's deposition and at the deposition itself that the Court

first learned of Monica Lewinsky, a former White House intern and employee, and her alleged

involvement in this case.

At his deposition, the President was questioned extensively about his relationship with

Ms. Lewinsky, this Court having previously ruled on December 11, 1997, that plaintiff was

"entitled to information regarding any individuals with whom the President had sexual relations

or proposed or sought to have sexual relations and who were during the relevant time frame [of

May 8, 1986, up to the present] state or federal employees." *See* December 11, 1997 Order, at 3.[4]

Based on that ruling, this Court overruled objections during the deposition from the President's

attorney, Robert S. Bennett, that questions concerning Ms. Lewinsky were inappropriate areas of

inquiry and required that such questions be answered by the President. *See* Pres. Depo. at 53-55,

66, 78. Having been so ordered, the President testified in response to questioning from plaintiff's

---

[3] Included in these Orders was a Confidentiality Order on Consent of all Parties. The Court entered this Order on October 30, 1997, due to the salacious nature of much of the discovery and the media's intense and often inaccurate coverage of this case. *See Jones v. Clinton*, 12 F.Supp.2d at 935-36. The Court took this action to help insure that a fair and impartial jury could be selected in the event this matter went to trial by limiting prejudicial pre-trial publicity and to protect the interests of the various Jane Does in maintaining privacy. *Id.* at 936-37.

[4] The Court's December 11th Order ruled on plaintiff's motion to compel responses to her second set of interrogatories, granting in part and denying in part the motion. However, the Court also addressed in the Order the President's upcoming deposition and concluded that for purposes of the deposition, not only was plaintiff entitled to information regarding any individuals with whom the President had sexual relations or proposed or sought to have sexual relations and who were during the relevant time frame state or federal employees, but that the Court would possibly permit plaintiff to question the President with regard to matters that fell outside that time frame if she had an independent basis for doing so. *See* December 11, 1997 Order, at 4.

counsel and his own attorney that he had no recollection of having ever been alone with Ms. Lewinsky and he denied that he had engaged in an "extramarital sexual affair," in "sexual relations," or in a "sexual relationship" with Ms. Lewinsky.[5] *Id.* at 52-53, 56-59, 78, 204.  An affidavit submitted by Ms. Lewinsky in support of her motion to quash a subpoena for her testimony and made a part of the record of the President's deposition likewise denied that she and the President had engaged in a sexual relationship.  When asked by Mr. Bennett whether Ms. Lewinsky's affidavit denying a sexual relationship with the President was a "true and accurate statement," the President answered, "That is absolutely true." Pres. Depo. at 204.

The President's denial of a sexual relationship with Ms. Lewinsky at his deposition was consistent with his answer of "None" in response to plaintiff's Interrogatory No. 10, which requested the name of each and every federal employee with whom he had sexual relations when he was President of the United States. *See* Pres. Clinton's Resp. to Pl's Second Set of Int. at 5; Pres. Clinton's Supp. Resp. to Pl.'s Second Set of Int. at 2.  This interrogatory was answered on December 23, 1997, after this Court had entered its December 11th Order ruling on plaintiff's motion to compel responses to her second set of interrogatories and finding that plaintiff was entitled to such information. *See* December 11, 1997 Order, at 3, 6.[6]

One day prior to the President's deposition, and unknown to this Court, the Special Division of the United States Court of Appeals for the District of Columbia Circuit granted a

---

[5] At the request of plaintiff's counsel, the term "sexual relations" was defined as follows during the deposition: "For the purposes of this deposition, a person engages in 'sexual relations' when the person knowingly engages in or causes ... contact with the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to arouse or gratify the sexual desire of any person.... 'Contact' means intentional touching, either directly or through clothing." *See* Depo. Ex. 1.

[6] The President's answer to this interrogatory was made a part of the record of the President's deposition.  There was no formal definition of the term "sexual relations" with respect to plaintiff's interrogatory or the President's answer.

request from Attorney General Janet Reno to expand the jurisdiction of Independent Counsel Kenneth W. Starr and entered an Order authorizing the Independent Counsel "to investigate ... whether Monica Lewinsky or others suborned perjury, obstructed justice, intimidated witnesses, or otherwise violated federal law other than a Class B or C misdemeanor or infraction in dealing with witnesses, potential witnesses, attorneys, or others concerning the civil case *Jones v. Clinton*." *In re Madison Guaranty Savings & Loan Ass'n*, Div. No. 94-1, 1998 WL 472444 (D.C.Cir.Sp.Div. Jan. 16, 1998). A short time later, the President's relationship with Ms. Lewinsky and OIC's investigation of that relationship broke in the national media.

On the afternoon of January 28, 1998, with less than 48 hours remaining in the period for conducting discovery, OIC filed with this Court a motion for limited intervention and stay of discovery in this civil case. OIC argued that counsel for plaintiff were deliberately shadowing the grand jury's investigation of the matter involving Ms. Lewinsky and that "the pending criminal investigation is of such gravity and paramount importance that this Court would do a disservice to the Nation if it were to permit the unfettered – and extraordinarily aggressive – discovery efforts currently underway to proceed unabated." Motion of OIC, at 2-3. This Court convened a telephone conference the following morning and, after eliciting the views of the parties and OIC, entered an Order granting in part and denying in part OIC's motion. *See Jones v. Clinton*, 993 F.Supp. 1217 (E.D.Ark. 1998) (Order denying plaintiff's motion for reconsideration). In essence, the Court concluded that the parties could continue with discovery in the short time that remained of those matters not involving Ms. Lewinsky, but that any discovery that did involve Ms. Lewinsky would not be allowed to go forward and, further, that

6

any evidence concerning Ms. Lewinsky would be excluded from the trial of this matter. *Id.* at 1218-19.[7]

Following the completion of discovery, the President and Ferguson each filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. By Memorandum Opinion and Order dated April 1, 1998, this Court granted the President's and Ferguson's motions for summary judgment and entered judgment dismissing this case. *See Jones v. Clinton*, 990 F.Supp. 657 (E.D.Ark. 1998). The Court concluded that there were no genuine issues for trial in this case and that defendants were entitled to judgment as a matter of law with respect to plaintiff's claims that she was subjected to *quid pro quo* and hostile work environment sexual harassment, that the defendants conspired to deprive her of her civil rights, and that she suffered emotional distress so severe in nature that no reasonable person could be expected to endure it. *Id.* The plaintiff appealed. Meanwhile, OIC's investigation of the President continued.

On August 17, 1998, the President appeared before a grand jury in Washington, D.C., as part of OIC's criminal investigation and testified about his relationship with Ms. Lewinsky and his actions during this civil lawsuit. That evening, the President discussed the matter in a

---

[7] In so ruling, and contrary to numerous assertions, this Court did not rule that evidence of the Lewinsky matter was irrelevant or immaterial to the issues in plaintiff's case. Indeed, the Court specifically acknowledged that such evidence might have been relevant to plaintiff's case and, as she argued, "might possibly have helped her establish, among other things, intent, absence of mistake, motive, and habit on the part of the President." 993 F.Supp. at 1222 (citing Fed.R.Evid. 404(b), 406). At the time, however, the Court anticipated that the President and Ms. Lewinsky would both deny a sexual relationship and that plaintiff would attempt to rebut their denials with extrinsic evidence that could be inadmissible under Fed.R.Evid. 608(b). To stay discovery so that plaintiff could explore such evidence would have required extensive additional delay. In that regard, this Court made the decision to disallow discovery as to Ms. Lewinsky and to exclude evidence concerning her from trial, not because the Court considered such evidence to be irrelevant or immaterial, but because its admission would frustrate the timely resolution of this case and cause undue expense and delay, the substantial interests of the Presidency militated against any undue delay that would be occasioned by allowing plaintiff to pursue the Lewinsky matter, and the government's criminal proceedings (to which this Court generally must yield in civil matters) could be impaired and prejudiced were the Court to permit inquiry into the Lewinsky matter by the parties in this civil case. *Id.* at 1219-20. The Court noted that evidence of the Lewinsky matter, even assuming it to be very favorable to plaintiff, was "not essential to the *core issues* in this case of whether plaintiff *herself* was the victim of *quid pro quo* sexual harassment, hostile work environment harassment, or intentional infliction of emotional distress." *Id.* at 1222 (emphasis in original).

televised address to the Nation.  In his address, the President stated that although his answers at his January 17th deposition were "legally accurate," he did not volunteer information and that he did indeed have a relationship with Ms. Lewinsky that was inappropriate and wrong.  *See* Pres. Addr., 1998 WL 14394084.  The President acknowledged misleading people, in part because the questions posed to him "were being asked in a politically inspired lawsuit which has since been dismissed," and because he "had real and serious concerns about an Independent Counsel investigation that began with private business dealings 20 years ago...."  *Id.*  It was during the President's televised address that the Court first learned the President may be in contempt.  *See Jones v. Clinton*, 12 F.Supp.2d at 938 n.5.[8]

On September 9, 1998, the Independent Counsel, having concluded there was substantial and credible information that the President committed acts that may constitute grounds for impeachment, submitted his findings from his investigation of the Lewinsky matter to the United States House of Representatives pursuant to 28 U.S.C. § 595(c).  The House of Representatives thereupon commenced impeachment proceedings, ultimately passing two Articles of Impeachment against the President, one alleging perjury in his August 17th testimony before the grand jury and the other alleging obstruction of justice in this civil case.  The matter then proceeded to trial in the United States Senate.

On November 13, 1998, while the impeachment proceedings were taking place in the House of Representatives, the plaintiff reached an out-of-court settlement for $850,000.00 and withdrew her appeal of this Court's April 1st decision granting summary judgment to defendants.

---

[8] In addressing the President's objections to the unsealing of the transcript of his deposition, this Court stated in footnote five as follows: "Although the Court has concerns about the nature of the President's January 17[th], 1998 deposition testimony given his recent public statements, the Court makes no findings at this time regarding whether the President may be in contempt."

8

*See Jones v. Clinton*, 161 F.3d 528 (8th Cir. 1998). Thereafter, on February 12, 1999, the Senate acquitted the President of both Articles of Impeachment.

Following the acquittal of the President, this Court held a telephone conference on February 16, 1999, to address the remaining issues before this Court, including the issue of attorney's fees and the issue of whether the President should be subject to contempt proceedings. *See* February 16, 1999 Order, at 2.[9] The Court explained to the parties that it had previously declined to address the issue of the President's contempt due to the fact that this case was on appeal at the time and Congress was conducting impeachment proceedings against the President. *See id.* at 3.[10] The Court explained that had this Court's grant of summary judgment to defendants been reversed and the case remanded, there would have been available certain sanctions that are unavailable otherwise. *Id.* The Court further explained that even though this litigation begat the controversy that was the subject of the President's impeachment trial in the Senate, the interests protected by the contempt authority of the Court are significantly different from the interests protected by the impeachment process. *Id.* In essence, stated the Court, the contempt authority protects the integrity of a court's proceedings and provides a means of enforcement of its orders, while impeachment is a constitutional process in which the proper inquiry is the President's fitness to serve in office. *Id.* Given this distinction, the Court determined that it should defer to Congress and its constitutional duties prior to this Court

---

[9] On March 4, 1999, an agreement was reached as to allocation of the $850,000.00 settlement, thus rendering moot all issues concerning attorneys' fees. *See* March 4, 1999 Order.

[10] After becoming aware of the President's possible contempt on August 17th, the Court learned through published reports that the House of Representatives may conduct proceedings to consider evidence of possible impeachable offenses against the President (proceedings of which in fact began on September 9th with the submission of the Independent Counsel's report to the House of Representatives). Those reports, and the fact that the matter was on appeal at the time, led to this Court's decision as stated in footnote five of the Court's September 1st Memorandum and Order to defer addressing at that time the matter of the President's contempt.

addressing the President's conduct in this civil case.

As the Court explained to the parties, however, it is now time to address the issue of the President's contempt as all other proceedings that heretofore have precluded this Court from addressing the issue have concluded. *Id.*[11] Accordingly, it is that issue to which the Court now turns.

## II.

The threshold question in this matter is whether a President of the United States can be held in civil contempt of court and thereby sanctioned. Although federal courts possess the authority to impose sanctions for civil contempt pursuant to the Federal Rules of Civil Procedure and their inherent authority, *see* Fed.R.Civ.P. 37(b)(2) (providing that a court may enter an order treating as a contempt of court the failure of a party to obey the court's orders); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (noting that the power to punish for contempts is inherent in all courts), no court has ever held a President in contempt of court. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring). *See also United States v. Nixon*, 418 U.S. 683, 692 (1974) (noting that the issue of whether a President can be cited for contempt could engender protracted litigation). Nevertheless, this Court has considered the

---

[11] The Court informed the parties that a member of the House Managers who prosecuted the impeachment trial against the President contacted the undersigned in early January of this year to let me know that he was considering calling me as a witness for the impeachment trial. I objected and was never subpoenaed or otherwise asked to testify. Later, a representative of the House Managers requested and, with my permission, received an affidavit concerning the President's deposition from my law clerk, Barry W. Ward, who attended the President's deposition. The Court allowed the parties an opportunity to request that I recuse from deciding the remaining issues in this case because of the House Manager's contact with me or because of Mr. Ward's affidavit, but none did so.

matter and finds no constitutional barrier to holding the President in civil contempt of court in this case and imposing sanctions.

This lawsuit involved private actions allegedly taken by the President before his term of office began, and the contumacious conduct on the part of the President was undertaken in his role as a litigant in a civil case and did not relate to his duties as President. Both the Court of Appeals for the Eighth Circuit and the Supreme Court held in this case that the Constitution does not place the President's unofficial conduct beyond judicial scrutiny. In so ruling, the Court of Appeals specifically rejected the President's argument that "because a federal court will control the litigation, the Third Branch necessarily will interfere with the Executive Branch through the court's scheduling orders *and its powers to issue contempt citations and sanctions*." *Jones v. Clinton*, 72 F.3d at 1361 (emphasis added). Likewise, the Supreme Court explained that "'[it] is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States,'" *Clinton v. Jones*, 520 U.S. at 705 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982)), and noted that "[i]f the judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct." *Id.*

Although not expressly addressed by the Supreme Court, a necessary incident of the power to determine the legality of the President's unofficial conduct includes the power to address unofficial conduct which threatens the integrity of the proceedings before the court. The sanctioning provisions in the Federal Rules of Civil Procedure vest federal courts with the power to address conduct which threatens the integrity of the judicial process, *see, e.g.,* Fed.R.Civ.P. 11

11

(providing that sanctions may be appropriate where a claim is presented for an improper purpose) and 37 (sanctions for failure to cooperate with discovery), and the existence in the federal courts of an inherent power "'necessary to the exercise of all others'" is likewise firmly established and "include[s] the ability to dismiss actions, assess attorneys' fees, and to impose monetary or other sanctions appropriate 'for conduct which abuses the judicial process.'" *Harlan v. Lewis*, 982 F.2d 1255, 1259 (8th Cir.) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812); *Chambers*, 501 U.S. at 44-45), *cert. denied*, 510 U.S. 828 (1993). *See also Spallone v. United States*, 493 U.S. 265, 276 (1990) (noting the axiom that courts have inherent power to enforce compliance with their lawful orders through civil contempt).

Certainly the Court recognizes that significant constitutional issues would arise were this Court to impose sanctions against the President that impaired his decision-making or otherwise impaired him in the performance of his official duties. *See Clinton v. Jones*, 520 U.S. at 708. No such sanctions will be imposed, however. Throughout the history of this case, this Court has attempted to apply the law to the President in the same manner as it would apply the law to any other litigant, keeping in mind the "high respect that is owed to the office of the Chief Executive" and the Supreme Court's directive that such respect "inform the conduct of the entire proceeding...." *See id.* at 707. In that regard, this Court will not impose greater sanctions against the President for his contumacious conduct in this case than would be imposed against any other litigant and member of the bar who engaged in similar misconduct. Moreover, this Court is aware that it is obliged to use the least possible power adequate to the end proposed in selecting contempt sanctions, *see Spallone*, 493 U.S. at 276, and will base the imposition of sanctions on a principle of proportionality, recognizing that the President's contumacious conduct occurred in a

12

case that was both dismissed on summary judgment as lacking in merit and in which the plaintiff was made whole, having agreed to a settlement in excess of that prayed for in her complaint.

In sum, the Court finds that the power to determine the legality of the President's unofficial conduct includes with it the power to issue civil contempt citations and impose sanctions for his unofficial conduct which abuses the judicial process.[12] That established, the Court now turns to the central issue of the President's contempt.

### A.

As noted earlier, a federal district court has two principal sources of authority for finding a party in civil contempt of its discovery orders: Fed.R.Civ.P. 37(b)(2) and the court's inherent power. *See, e.g., Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C.Cir. 1998); *Jones v. Thompson*, 996 F.2d 261, 264 (10th Cir. 1993); *Cobell v. Babbitt*, — F.Supp.2d —, 1999 WL 101636, at *2 (D.D.C. 1999). Pursuant to Rule 37(b)(2), a court may hold a party in contempt of court for failing to obey an order to provide discovery and may impose several specific, nonexclusive sanctions to address such misconduct, "the parameters of the available measures being 'such orders in regard to the failure as are just.'" *Cobell*, — F.Supp.2d —, 1999 WL 101636, at *2-3 (quoting Fed.R.Civ.P. 37(b)(2)). However, when rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap. *Shepherd v. American Broadcasting Companies, Inc.*,

---

[12] Every district court "has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers*, 501 U.S. at 44. Although this civil action has been terminated, "[a] court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990). In addition, a court generally may act *sua sponte* in imposing sanctions. *Chambers*, 501 U.S. at 42 n.8.

62 F.3d 1469, 1474 (D.C.Cir. 1995) (citing *Chambers*, 501 U.S. at 46). In this regard, a court has the "inherent power to protect [its] integrity and prevent abuses of the judicial process" by holding a party in contempt and imposing sanctions for violations of the court's orders. *Cobell*, — F.Supp.2d —, 1999 WL 101636, at *2 (quoting *Webb*, 146 F.3d at 971). When the source of the civil contempt is a failure to comply with a discovery order, the analysis and available remedies under Fed.R.Civ.P. 37 and the court's inherent power are essentially the same. *Id.* at *2-3. *Cf. Dillon v. Nissan Motor Co.*, 986 F.2d 263, 268-69 (8th Cir. 1993) (noting the comparability of sanctions under Fed.R.Civ.P. 37 and sanctions under the court's inherent power); *Gates Rubber Co. v. Bando Chem. Ind., Ltd.*, 167 F.R.D. 90, 107 (D.Co. 1996) (noting that "Rule 37 and the inherent powers of the court may be different routes by which to reach a result, but the analysis of the criteria along the way can be exactly the same"). Two requirements must be met before a party may be held in civil contempt: the court must have fashioned an Order that is clear and reasonably specific, and the party must have violated that Order. *Cobell*, — F.Supp.2d —, 1999 WL 101636, at *2 (citations omitted). Generally, these two requirements must be shown by clear and convincing evidence. *Id.* Although these requirements apply whether the court is proceeding under the Fed.R.Civ.P. 37 or its inherent power, *see id.*, a court ordinarily should turn to its inherent powers only as a secondary measure when a discovery order has been violated. *Id.* at *3. *See also Chambers*, 501 U.S. at 50 (noting that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power"). Accordingly, this Court addresses the President's contumacious conduct under Fed.R.Civ.P. 37(b)(2), finding that rule sufficient in its scope to redress the abuse of the judicial process that occurred in this case.

1.

Fed.R.Civ.P. 37(b)(2) sets forth a broad range of sanctions that a district court may impose upon parties for their failure to comply with the court's discovery orders. The Rule provides that if a party fails to obey an order to provide or permit discovery, the court "may make such orders in regard to the failure as are just" and, among others, impose the following sanctions: (1) the court may order that the matters regarding which the order was made or any other designated facts be taken as established for the purposes of the action in accordance with the claim of the party obtaining the order; (2) the court may refuse to allow the disobedient party to support or oppose designated claims or defenses, or prohibit that party from introducing designated matters in evidence; (3) the court may strike any pleadings or parts thereof, stay further proceedings until the order is obeyed, dismiss the action or proceeding or any part thereof, or render a judgment of default against the disobedient party; and (4) the court may, in lieu of any of the foregoing sanctions or in addition thereto, enter an order treating as a contempt of court the failure of the party to obey the court's orders. Fed.R.Civ.P. 37(b)(2). In addition to those sanctions, the Rule provides:

> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order ... to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(b)(2).

a.

On two separate occasions, this Court ruled in clear and reasonably specific terms that

15

plaintiff was entitled to information regarding any individuals with whom the President had sexual relations or proposed or sought to have sexual relations and who were during the relevant time frame state or federal employees. *See* December 11, 1997 Order, at 3; Pres. Depo. at 53-55, 66, 78.[13] Notwithstanding these Orders, the record demonstrates by clear and convincing evidence that the President responded to plaintiff's questions by giving false, misleading and evasive answers that were designed to obstruct the judicial process. The President acknowledged as much in his public admission that he "misled people" because, among other things, the questions posed to him "were being asked in a politically inspired lawsuit, which has since been dismissed." Although there are a number of aspects of the President's conduct in this case that might be characterized as contemptuous, the Court addresses at this time only those matters which no reasonable person would seriously dispute were in violation of this Court's discovery Orders and which do not require a hearing, namely the President's sworn statements concerning whether he and Ms. Lewinsky had ever been alone together and whether he had ever engaged in sexual relations with Ms. Lewinsky.[14]

---

[13] As a general matter, a production order is needed to trigger Rule 37(b). *See, e.g., Shepherd,* 62 F.3d at 1474; *Kropp v. Ziebarth,* 557 F.2d 142, 146 n.7 (8th Cir. 1977). Here, the Court's December 11th Order ruling on plaintiff's motion to compel and addressing aspects of the President's deposition constitutes a production order within the meaning of Rule 37(b), as does the Court's oral ruling at the President's deposition that the Lewinsky matter was, consistent with the December 11th Order, a proper subject of inquiry and that the President was required to answer such questions from plaintiff's counsel. *Cf Jones v. Uris Sales Corp.,* 373 F.2d 644, 647-48 (2nd Cir. 1967) (proceedings before district court during which the judge issued an oral order requiring compliance with the subpoena provided a proper basis for Rule 37(b)(2) sanction).

[14] Other possible contumacious conduct on the part of the President that the Court does not address at this time includes his possible violation of this Court's admonition not to discuss the deposition with anyone. At the conclusion of the President's deposition, the Court stated as follows: "Before he leaves, I want to remind him, and everyone else in the room, that this case is subject to a Protective Order ... and therefore all parties present, including Secret Service agents, videographers, court reporters and the witness are not to say anything whatsoever about the questions they were asked, the substance of the deposition, the length of it, objections, recess, any details, whether the President did well or did not do well, whether he is credible or not credible, [or] whether he admitted or denied any specific allegations...." Pres. Depo. at 212-13. This admonition was an oral reiteration of the Court's October 30th Confidentiality Order on Consent of all Parties and constituted an expansion of the Order to persons present at the deposition who would otherwise not have been subject to its provisions. While the President may have violated the Confidentiality Order, *see, e.g.,* Pres. GJ Test. at 54-58 (wherein the President testified that he approached his secretary the day after the deposition in order to ascertain information regarding some of the questions that were asked of him by plaintiff's counsel), the record in this case suggests that there were violations of the Confidentiality Order attributable to other

i.

At his January 17th deposition, the President responded to a series of questions regarding whether he and Ms. Lewinsky had ever been alone together by maintaining that he could not recall being alone with her. The President testified as follows:

Q. Mr. President, before the break, we were talking about Monica Lewinsky. At any time were you and Monica Lewinsky together alone in the Oval Office?

A. I don't recall, but as I said, when she worked at the legislative affairs office, they always had somebody there on the weekends. I typically worked some on the weekends. Sometimes they'd bring me things on the weekends. She – it seems to me she brought things to me once or twice on the weekends. In that case, whatever time she would be in there, drop it off, exchange a few words and go, she was there. I don't have any specific recollections of what the issues were, what was going on, but when the Congress is there, we're working all the time, and typically I would do some work on one of the days of the weekends in the afternoon.

Q. So I understand, your testimony is that it was possible, then, that you were alone with her, but you have no specific recollection of that ever happening?

A. Yes, that's correct. It's possible that she, in, while she was working there, brought something to me and that at the time she brought it to me, she was the only person there. That's possible.

\* \* \*

Q. Do you ever recall walking with Monica Lewinsky down the hallway from the Oval Office to your private kitchen there in the White House?

A. ... [M]y recollection is that, that at some point during the government shutdown, when Ms. Lewinsky was still an intern but was working the chief staff's office because all the employees had to go home, that she was back there with a pizza that she brought to me and to others. I do not believe she was there alone, however. I don't think she was. And my recollection is that on a couple of occasions after that she was there but my secretary, Betty Currie, was there with

---

individuals within the jurisdiction of this Court as well. Ascertaining whether the President or other individuals violated the Confidentiality Order – either with respect to the deposition or otherwise – would require hearings and the taking of evidence. For reasons to be stated, the Court determines that such hearings are not in the best interests of the President or this Court. *See* Section II(B), *infra*.

her. She and Betty are friends. That's my, that's my recollection. And I have no other recollection of that.

*  *  *

Q. At any time were you and Monica Lewinsky alone in the hallway between the Oval office and this kitchen area?

A. I don't believe so, unless we were walking back to the back dining room with the pizza. I just, I don't remember. I don't believe we were alone in the hallway, no.

*  *  *

Q. At any time have you and Monica Lewinsky ever been alone together in any room in the White House?

A. I think I testified to that earlier. I think that there is a, it is – I have no specific recollection, but it seems to me that she was on duty on a couple of occasions working for the legislative affairs office and brought me some things to sign, something on the weekend. That's – I have a general memory of that.

Pres. Depo. at 52-53, 56-59.

At his August 17th appearance before the grand jury, the President directly contradicted

his deposition testimony by acknowledging that he had indeed been alone with Ms. Lewinsky on

a number of occasions during which they engaged in "inappropriate intimate contact." Pres. GJ

Test. at 9-10. He stated he also was alone with her "from time to time" when there was no

"improper contact" occurring. *Id.* at 134. The President began his testimony by reading a

statement which reads in part as follows:

When I was alone with Ms. Lewinsky on certain occasions in early 1996 and once in early 1997, I engaged in conduct that was wrong. These encounters did not consist of sexual intercourse. They did not constitute sexual relations as I understood that term to be defined at my January 17th, 1998 deposition. But they did involve inappropriate intimate contact. These inappropriate encounters ended,

at my insistence, in early 1997.

*Id.* at 9-10. The President then testified as follows in response to questions regarding whether he

and Ms. Lewinsky had ever been alone together:

> Q. Let me ask you, Mr. President, you indicate in your statement that you were
> alone with Ms. Lewinsky. Is that right?
>
> A. Yes, sir.
>
> Q. How many times were you alone with Ms. Lewinsky?
>
> A. Let me begin with the correct answer. I don't know for sure. But if you
> would like me to give an educated guess, I will do that, but I do not know for sure.
> And I will tell you what I think, based on what I remember. But I can't be held to
> a specific time, because I don't have records of all of it.
>
> Q. How many times do you think?
>
> A. Well, there are two different periods here. There's the period when she
> worked in the White House until April of '96. And then there's the period when
> she came back to visit me from February of '97 until late December '97.
>      Based on our records – let's start with the records, where we have the best
> records and the closest in time. Based on our records, between February and
> December, it appears to me that at least I could have seen her approximately nine
> times. Although I do not believe I saw her quite that many times, at least it could
> have happened.
>      There were – we think there were nine or 10 times when she was in, in the
> White House when I was in the Oval Office when I could have seen her. I do not
> believe I saw her that many times, but I could have. * * * I remember specifically,
> I have a specific recollection of two times. I don't remember when they were, but
> I remember twice when, on Sunday afternoon, she brought papers down to me,
> stayed, and we were alone.
>      And I am frankly quite sure – although I have no specific memory, I am
> quite sure there were a couple of more times, probably two times more, three
> times more. That's what I would say. That's what I can remember. But I do not
> remember when they were, or at what time of day they were, or what the facts
> were. But I have a general memory that would say I certainly saw her more than
> twice during that period between January and April of 1996, when she worked
> there.

*Id.* at 30-32. In addition, the President recalled a specific meeting on December 28, 1997, less

than three weeks prior to his January 17th deposition, at which he and Ms. Lewinsky were alone together. *Id.* at 34. The President went on to acknowledge that he tried to conceal his "inappropriate intimate relationship" with Ms. Lewinsky by not telling anyone about the relationship and by "do[ing] it where nobody else was looking at it," stating that he would have to be an "exhibitionist not to have tried to exclude everyone else." *Id.* at 38, 54. The President testified as follows in response to a question regarding how many times that occurred:

> Well, if you go back to my statement, I remember there were a few times in '96, I can't say with any certainty. There was once in early '97. After she left the White House, I do not believe I ever had any inappropriate contact with her in the rest of '96. There was one occasion in '97 when, regrettably, that we were alone together for a few minutes, I think about 20 minutes, and there was inappropriate contact. And after that, to the best of my memory and belief, it did not occur again.

*Id.* at 38-39.


### ii.

With respect to whether he and Ms. Lewinsky had engaged in sexual relations, the President testified at his January 17th deposition as follows:

Q.  Did you have an extramarital sexual affair with Monica Lewinsky?

A.  No.

Q.  If she told someone that she had a sexual affair with you beginning in November of 1995, would that be a lie?

A.  It's certainly not the truth.  It would not be the truth.

Q.  I think I used the term "sexual affair."  And so the record is completely clear, have you ever had sexual relations with Monica Lewinsky, as that term is defined in Deposition Exhibit 1, as modified by the Court?

   Mr. Bennett: I object because I don't know that he can remember –

The Court: Well, it's real short.  He can – I will permit the question and you may show the witness definition number one.

A.  I have never had sexual relations with Monica Lewinsky.  I've never had an affair with her.

Pres. Depo. at 78.

The President confirmed these denials in response to questioning from his attorney regarding Ms. Lewinsky's affidavit and whether he and Ms. Lewinsky ever had a "sexual relationship":

Q.  In paragraph eight of her affidavit, she says this, "I have never had a sexual relationship with the President, he did not propose that we have a sexual relationship, he did not offer me employment or other benefits in exchange for a sexual relationship, he did not deny me employment or other benefits for rejecting a sexual relationship."  Is that a true and accurate statement as far as you know it?

A.  That is absolutely true.

Id. at 204.

Consistent with his denial at his deposition of a sexual relationship with Ms. Lewinsky, the President had earlier answered "None" in response to plaintiff's Interrogatory No. 10, which stated as follows:

Please state the name, address, and telephone number of each and every [federal employee] with whom you had sexual relations when you [were] ... President of the United States.

See Pres. Clinton's Resp. to Pl's Second Set of Int. at 5; Pres. Clinton's Supp. Resp. to Pl.'s Second Set of Int. at 2.  As previously noted, this interrogatory was answered without regard to a formal definition of the term "sexual relations" after this Court had entered its December 11th Order ruling that plaintiff was entitled to such information.

At his August 17th grand jury appearance, the President directly contradicted his deposition testimony by acknowledging "inappropriate intimate contact" with Ms. Lewinsky on numerous occasions. Pres. GJ Test. at 9-10, 38-39, 54. When asked by a grand juror what he meant by "inappropriate contact," the President stated, "What I meant was, and what they can infer that I meant was, that I did things that were – when I was alone with her, that were inappropriate and wrong." *Id.* at 92-93. The President repeatedly refused to provide answers to questions regarding specific sexual activity between himself and Ms. Lewinsky, instead referring to his statement acknowledging "inappropriate intimate contact" and stating that "sexual relations" as defined by himself and "most ordinary Americans" means, for the most part, only intercourse. *Id.* at 12, 22-24, 92-94, 102-03, 110-11, 139, 168. Nevertheless, the President, while claiming that he did not engage in intercourse with Ms. Lewinsky and did not engage in any other contact with her that would fall within the definition of "sexual relations" used at his deposition, acknowledged that the nature of his "inappropriate intimate contact" with Ms. Lewinsky was such that he would have been an "exhibitionist" had it been viewed by others. *Id.* at 10, 12, 54, 96. The President went on to state that he did not believe he violated the definition of sexual relations he was given "by directly touching those parts of her body with the intent to arouse or gratify." *Id.* at 139, 168.

b.

It is difficult to construe the President's sworn statements in this civil lawsuit concerning his relationship with Ms. Lewinsky as anything other than a willful refusal to obey this Court's discovery Orders. Given the President's admission that he was misleading with regard to the

22

questions being posed to him and the clarity with which his falsehoods are revealed by the record,[15] there is no need to engage in an extended analysis of the President's sworn statements in this lawsuit. Simply put, the President's deposition testimony regarding whether he had ever been alone with Ms. Lewinsky was intentionally false, and his statements regarding whether he had ever engaged in sexual relations with Ms. Lewinsky likewise were intentionally false, notwithstanding tortured definitions and interpretations of the term "sexual relations."[16]

Certainly the President's aggravation with what he considered a "politically inspired lawsuit" may well have been justified, although the Court makes no findings in that regard. Even assuming that to be so, however, his recourse for the filing of an improper claim against him was to move for the imposition of sanctions against plaintiff. *See, e.g., Clinton v. Jones*, 520 U.S. at 708-09 (noting the availability of sanctions for litigation directed at the President in his unofficial capacity for purposes of political gain or harassment). The President could, for example, have moved for sanctions pursuant to Fed.R.Civ.P. 11 if, as he intimated in his address to the Nation, he was convinced that plaintiff's lawsuit was presented for an improper purpose and included claims "based on 'allegations and other factual contentions [lacking] evidentiary support' or unlikely to prove well-grounded after reasonable investigation." *Id.* at 709 n.42 (quoting

---

[15] Indeed, even though the President's testimony at his civil deposition was entirely consistent with Ms. Lewinsky's affidavit denying "sexual relations" between herself and the President, the President's attorney later notified this Court pursuant to his professional responsibility that portions of Ms. Lewinsky's affidavit were reported to be "misleading and not true" and that this Court should not rely on Ms. Lewinsky's affidavit or remarks of counsel characterizing that affidavit. *See* Letter of September 30, 1998. The President's testimony at his deposition that Ms. Lewinsky's denial in her affidavit of a "sexual relationship" between them was "absolutely true" likewise was "misleading and not true."

[16] The President seemed to accept OIC's characterization of his improper contact with Ms. Lewinsky as "some kind of sex" and as a "physically intimate" relationship. Pres. GJ Test. at 123, 136. Although the President did not disclose any specific sexual acts between himself and Ms. Lewinsky, he did state that oral sex performed by Ms. Lewinsky on himself would not constitute "sexual relations" as that term was defined by plaintiff at his deposition. *Id.* at 93, 100, 102, 104-05, 151-52, 168. It appears the President is asserting that Ms. Lewinsky could be having sex with him while, at the same time, he was not having sex with her.

Fed.R.Civ.P. 11(b)(1), (3)). The President never challenged the legitimacy of plaintiff's lawsuit by filing a motion pursuant to Rule 11, however, and it simply is not acceptable to employ deceptions and falsehoods in an attempt to obstruct the judicial process, understandable as his aggravation with plaintiff's lawsuit may have been. "A lawsuit is not a contest in concealment, and the discovery process was established so that 'either party may compel the other to disgorge whatever facts he has in his possession.'" *Southern Railway Co. v. Lanham*, 403 F.3d 119, 130 (5th Cir. 1968) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

In sum, the record leaves no doubt that the President violated this Court's discovery Orders regarding disclosure of information deemed by this Court to be relevant to plaintiff's lawsuit. The Court therefore adjudges the President to be in civil contempt of court pursuant to Fed.R.Civ.P. 37(b)(2).

2.

The Court now turns to the issue of appropriate sanctions. Several of the sanctions contemplated by Fed.R.Civ.P. 37(b)(2) are unavailable to this Court as the underlying lawsuit has been terminated. The Court cannot, for example, order that the matters upon which the President gave false statements be taken as established, nor can the Court render a default judgment against the President, both of which the Court would have considered had this Court's grant of summary judgment to defendants been reversed and remanded. Moreover, as the Court earlier noted, the determination of appropriate sanctions must take into account that this case was dismissed on summary judgment as lacking in merit – a decision that would not have changed even had the

24

President been truthful with respect to his relationship with Ms. Lewinsky[17] – and that plaintiff

was made whole, having settled this case for an amount in excess of that prayed for in her

complaint. Nevertheless, the President's contumacious conduct in this case, coming as it did

from a member of the bar and the chief law enforcement officer of this Nation, was without

justification and undermined the integrity of the judicial system. "[O]ur adversary system

depends on a most jealous safeguarding of truth and candor," *United States v. Shaffer Equip. Co.*,

11 F.3d 450, 463 (4th Cir. 1993), and "[t]he system can provide no harbor for clever devises to

divert the search, mislead opposing counsel or the court, or cover up that which is necessary for

justice in the end." *Id.* at 457-58. Sanctions must be imposed, not only to redress the misconduct

of the President in this case, but to deter others who, having observed the President's televised

address to the Nation in which his defiance of this Court's discovery Orders was revealed, might

themselves consider emulating the President of the United States by willfully violating discovery

orders of this and other courts, thereby engaging in conduct that undermines the integrity of the

judicial system. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639,

643 (1976) (noting that "other parties to other lawsuits would feel freer than we think Rule 37

contemplates they should feel to flout other discovery orders of other district courts" if

contumacious conduct was left unaddressed) (per curiam); *Roadway Express v. Piper*, 447 U.S.

752, 763-64 (1980) (noting that Rule 37 sanctions must be applied diligently, both to penalize

those whose conduct warrants sanctions and to deter those who might be tempted to sanctionable

---

[17] The Court noted that whether other women may have been subjected to workplace harassment does not change the fact that plaintiff has failed to demonstrate that she "*herself* was the victim of alleged *quid pro quo* or hostile work environment sexual harassment, [that] the President and Ferguson conspired to deprive *her* of her civil rights, or [that] *she* suffered emotional distress so severe in nature that no reasonable person could be expected to endure it." *Jones v. Clinton*, 990 F.Supp. at 678-79 (emphasis in original).

conduct in the absence of such a deterrent). Accordingly, the Court imposes the following

sanctions:

First, the President shall pay plaintiff any reasonable expenses, including attorney's fees,

caused by his willful failure to obey this Court's discovery Orders. Plaintiff's former counsel are

directed to submit to this Court a detailed statement of any expenses and attorney's fees incurred

in connection with this matter within twenty (20) days of the date of entry of this Memorandum

Opinion and Order.

Second, the President shall reimburse this Court its expenses in traveling to Washington,

D.C. at his request to preside over his tainted deposition. The Court therefore will direct that the

President deposit into the registry of this Court the sum of $1,202.00, the total expenses incurred

by this Court in traveling to Washington, D.C.[18]

In addition, the Court will refer this matter to the Arkansas Supreme Court's Committee

on Professional Conduct for review and any disciplinary action it deems appropriate for the

President's possible violation of the Model Rules of Professional Conduct.[19] Relevant to this

case, Rule 8.4 of the Model Rules provides that it is professional misconduct for a lawyer to,

among other things, "engage in conduct involving dishonesty, fraud, deceit or

misrepresentation," or to "engage in conduct that is prejudicial to the administration of justice."

---

[18] The undersigned and Mr. Ward departed Little Rock, Arkansas for Washington, D.C. on January 16, 1998, and returned to Little Rock on January 18, 1998. Total expenses were incurred in accordance with the rules and regulations set forth in the *Guide to Judiciary Policies and Procedures*, Volumes I and III. In this respect, air fare was $216.00 per ticket and subsistence was $374.00 each. Remaining expenses totaled $22.00.

[19] The Committee on Professional Conduct acts as an arm of the Arkansas Supreme Court in matters relating to the supervision and licensing of Arkansas attorneys, of which the President is one, and that Court has exclusive jurisdiction over the conduct of Arkansas attorneys and has the power to make rules regulating the practice of law and the professional conduct of attorneys of law. *See Neal v. Wilson*, 920 F.Supp. 976, 987-88 (W.D.Ark. 1996), *aff'd*, 112 F.3d 351 (8th Cir. 1997). In that regard, the Arkansas Supreme Court has adopted the American Bar Association's Model Rules of Professional Conduct as the State of Arkansas's code of professional responsibility. *See In re Arkansas Bar Ass'n*, 287 Ark. 495, 702 S.W.2d 326 (1985).

The President's conduct as discussed previously arguably falls within the rubric of Rule 8.4 and involves matters that the Committee on Professional Conduct may deem appropriate for disciplinary action.[20]

## B.

In addressing only the President's sworn statements concerning his relationship with Ms. Lewinsky, this Court is fully aware that the President may have engaged in other contumacious conduct warranting the imposition of sanctions. *See* n.13, *supra*. The Court determines, however, that this matter can be summarily addressed by focusing on those specific instances of the President's misconduct with which there is no factual dispute and which primarily occurred directly before the Court. While hearings might have been necessary were there an issue regarding the President's willfulness in failing to obey the Court's discovery Orders, the circumstances surrounding the President's failure to disclose his relationship with Ms. Lewinsky as ordered by this Court are undisputed and contained within the record. The President has essentially admitted that he intended to mislead plaintiff in her efforts at gaining information deemed by this Court to be relevant, and hearings would not assist the Court in addressing the President's misconduct regarding his failure to obey this Court's discovery Orders. Thus, no possible prejudice to the President can result from this Court utilizing summary procedures rather than convening hearings. Indeed, it is in the best interests of the President and this Court that this

---

[20] In referring this matter to the Committee on Professional Conduct, this Court does not thereby relinquish jurisdiction to address the matter itself and issue sanctions. Rather than having been displaced, the authority of this Court to sanction attorneys is independent of, and in addition to, the power of review possessed by the Committee on Professional Conduct. *See Harlan v. Lewis*, 982 F.2d at 1261 (noting that "[a] district judge must have the power to deal with conduct of attorneys in litigation without delegating this responsibility to state disciplinary mechanisms," and that "[s]tate disciplinary authorities may act in such cases if they choose, but this does not limit the power or responsibility of the district court").

matter be expeditiously resolved. Hearings to address other possible instances of misconduct on the part of the President could possibly be quite extensive and would require the taking of evidence, including, if necessary, testimony from witnesses.

This is not to say that the Court considers other instances of possible Presidential misconduct in this case unworthy of the Court's attention. In fact, the Court fully considered addressing all of the President's possible misconduct pursuant to the criminal contempt provisions set forth in Fed.R.Crim.P. 42, but determines that such action is not necessary at this time for two primary reasons.[21]

First, the summary adjudication procedures delineated in Rule 42(a) are most likely inapplicable in this case since the power summarily to convict and punish for contempt of court under that rule generally "rests on the proposition that a hearing to determine guilt of contempt is not necessary when contumacious conduct occurs in the actual presence of a judge who observes it, and when immediate action is required to preserve order in the proceedings and appropriate respect for the tribunal." *Smith v. Smith*, 145 F.3d 335, 342-43 (5th Cir. 1998) (quoting *In re Chaplain*, 621 F.2d 1272, 1275 (4th Cir.), *cert. denied*, 449 U.S. 834 (1980)). Here, the Court was not aware of any of the instances of the President's possible misconduct until well after this case had been dismissed on summary judgment, and immediate action was not required to preserve order in the proceedings. *See International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 832-33 (1994) (noting that "[s]ummary adjudication becomes less

---

[21] Under 18 U.S.C. § 401, federal courts possess the power to impose sanctions for criminal contempt committed in or near the presence of the court. When invoking this power, courts must follow one of two procedures set forth in Fed.R.Crim.P. 42. Pursuant to Rule 42(a), a court may punish direct contempt, *i.e.*, that contempt which occurs within the "actual presence" of the court, in a summary fashion. For conduct beyond the scope of Rule 42(a), such as indirect contempts that occur out of court, Rule 42(b) requires such other criminal contempts to be prosecuted upon notice and a hearing. *See Schleper v. Ford Motor Co.*, 585 F.2d 1367, 1372 (8th Cir. 1978).

justifiable once a court leaves the realm of immediately sanctioned, petty direct contempts," and that "[if] a court delays punishing a direct contempt until the completion of trial, for example, due process requires that the contemnor's rights to notice and a hearing be respected").

Second, resolving the matter expeditiously and without hearings pursuant to Rule 42(b) is in the best interests of both the President and this Court. Were the Court to delve into conduct which arguably was contumacious but which is not fully apparent from the record, this Court, as previously noted, would be required to hold hearings and take evidence, including, if necessary, testimony from witnesses. Such hearings could possibly last several weeks and might require referral of the matter to a prosecutor. *See United States v. Neal*, 101 F.3d 993, 997-98 (4th Cir. 1996) (noting that when contumacious conduct occurs out of the presence of the court or does not interfere with ongoing proceedings immediately before the court, contempt power does not permit a judge to dispense with a prosecutor altogether and fill the role himself). Because much of the President's conduct has been or is being investigated by OIC, and in order to prevent any potential double jeopardy issues from arising, *see, e.g., United States v. Dixon*, 509 U.S. 688, 696 (1993) (noting that protection of the double jeopardy clause applies to nonsummary criminal contempt prosecutions), this Court will forego proceeding under Fed.R.Crim.P. 42 and address the President's contempt by focusing on those undisputed matters that are capable of being summarily addressed pursuant to Fed.R.Civ.P. 37(b)(2). *See Bagwell*, 512 U.S. at 833 (noting that certain indirect contempts are appropriate for imposition through civil procedings, including contempts impeding the courts ability to adjudicate the proceedings before it and those contempts

involving discrete, readily ascertainable acts).[22]

Nevertheless, the Court will convene a hearing at the request of the President should he desire an opportunity in which to demonstrate why he is not in civil contempt of court, why sanctions should not be imposed, or why the Court is otherwise in error in proceeding in the manner in which it has. In that regard, the Court will stay enforcement of this Memorandum Opinion and Order for thirty (30) days from the date of its entry in which to give the President an opportunity to request a hearing or file a notice of appeal. In addition, the Court will entertain any legitimate and reasonable requests from the President for extensions of time in which to address the matter. Should the President fail to request a hearing or file a notice of appeal within the time allowed, the Court will enter an Order setting forth the time and manner by which the President is to comply with the sanctions herein imposed. Should the President succeed in obtaining a hearing, however, whether at his request or by way of appeal, any interests in an expeditious resolution of this matter and in sparing the President and this Court the turmoil of evidentiary hearings will no longer be a consideration. Accordingly, the President is hereby put on notice that this Court will take evidence at any future hearings – including, if necessary, testimony from witnesses – on all matters concerning the President's conduct in this lawsuit

---

[22] In electing to proceed under Fed.R.Civ.P. 37(b)(2), the Court also avoids any constitutional issues that might arise from addressing the matter in a criminal context. As noted in Section II of this Memorandum Opinion and Order, the Supreme Court essentially resolved the question of whether a President can be cited for civil contempt by holding, in a *civil* proceeding, that the Constitution does not place the President's unofficial conduct beyond judicial scrutiny. *See Clinton v. Jones,* 520 U.S. at 705. Criminal contempt, however, "is a *crime* in the ordinary sense," *see Bagwell,* 512 U.S. at 826 (quoting *Bloom v. Illinois,* 391 U.S. 194, 201 (1968)) (emphasis added), and the question of whether a President can be held in criminal contempt of court and subjected to criminal penalties raises constitutional issues not addressed by the Supreme Court in the *Jones* case. Such issues could engender protracted litigation, *see United States v. Nixon,* 418 U.S. at 692, and consume the resources of both the President and this Court.

which may warrant a finding of civil contempt.[23]

## III.

The Court takes no pleasure whatsoever in holding this Nation's President in contempt of court and is acutely aware, as was the Supreme Court, that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton v. Jones*, 520 U.S. at 697. As noted earlier, however, this Court has attempted throughout this case to apply the law to the President in the same manner as it would apply the law to any other litigant, keeping in mind the duties and status of the Presidency and the "high respect" that is to be accorded his office. *See Clinton v. Jones*, 520 U.S. at 707. In that regard, there simply is no escaping the fact that the President deliberately violated this Court's discovery Orders and thereby undermined the integrity of the judicial system. Sanctions must be imposed, not only to redress the President's misconduct, but to deter others who might themselves consider emulating the President of the United States by engaging in misconduct that undermines the integrity of the judicial system. Accordingly, the Court adjudges the President to be in civil contempt of court pursuant to Fed.R.Civ.P. 37(b)(2) for his willful failure to obey this Court's discovery Orders and hereby orders the following:

1. The President shall pay plaintiff any reasonable expenses, including attorney's fees, caused by his willful failure to obey this Court's discovery Orders. Plaintiff's former counsel are

---

[23] The scheduling of any hearings would, of course, be considerate to the President's schedule and his conducting the duties of his office. The Court is particularly mindful of the crisis in Yugoslavia and recognizes that the President must not be distracted in his attention to that situation or other issues of immense importance.

31

directed to submit to this Court a detailed statement of any expenses and attorney's fees incurred in connection with this matter within twenty (20) days of the date of entry of this Memorandum Opinion and Order.

2. The President shall deposit into the registry of this Court the sum of $1,202.00, the total expenses incurred by this Court in traveling to Washington, D.C. at the President's request to preside over his January 17th deposition.

In addition, the Court will refer this matter to the Arkansas Supreme Court's Committee on Professional Conduct for review and any action it deems appropriate.

The Court will stay enforcement of this Memorandum Opinion and Order for thirty (30) days from the date of its entry in order to allow the President an opportunity to request a hearing or file a notice of appeal. Should the President fail to timely request a hearing or file a notice of appeal, the Court will enter an Order setting forth the time and manner by which the President is to comply with the sanctions herein imposed.

IT IS SO ORDERED this 12th day of April 1999.

CHIEF JUDGE
UNITED STATES DISTRICT COURT

32